# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |
|---|---|
| In Re: Young Consulting Data Breach Litigation | Case No.: 1:24-cv-03938-TWT **DEMAND FOR JURY TRIAL** |

## <u>CONSOLIDATED AMENDED CLASS ACTON COMPLAINT</u>

Plaintiffs Kevin Chinchilla Montero, Emily Desley-Bloom, James Kelly, Brianna Martin, Alexandra Murillo, Ann Wasserman, and Mathew Werber (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this Consolidated Class Action Complaint on behalf of themselves and all others similarly situated (the "Class") against Defendants Young Consulting, LLC, doing business as Connexure ("Young Consulting"), and California Physicians' Service, doing business as Blue Shield of California ("Blue Shield") (collectively, "Defendants"). Except as to allegations specifically pertaining to Plaintiffs, which are based on personal knowledge, the following allegations are made upon information and belief, including investigation conducted by counsel.

## <u>NATURE OF THE ACTION</u>

1.      This action arises from a significant hub-and-spoke data breach that exposed the personally identifiable information ("PII") and protected health information ("PHI") of at least 1,071,336 individuals (collectively, "Private

Information"). The breach resulted from Defendants' failure to implement adequate data security measures and provide timely notification to affected individuals.

2.      Young Consulting is a Georgia-based company that provides "software solutions for the marketing, underwriting and administering of medical stop loss insurance."[1] Young Consulting collects and processes sensitive data on behalf of its clients, including Blue Shield of California, a health insurer that serves 4.5 million members.

3.      Between April 10 and April 13, 2024, a ransomware group known as BlackSuit infiltrated Young Consulting's network, accessed and exfiltrated confidential files, and later published stolen data on the dark web (the "Data Breach"). The compromised information includes names, Social Security numbers, dates of birth, and insurance claims information. Young Consulting reportedly detected the breach on April 13, 2024, but did not begin notifying victims and regulators until August 26, 2024—more than four months later.

4.      Young Consulting initially reported that the Data Breach affected approximately 950,000 individuals. However, nearly a year later, it increased that figure to 1,071,336. It remains unclear what proportion of affected individuals have received formal notice, or whether the total number will continue to rise.

---

[1] Young Consulting, https://youngconsulting.com/ (last visited July 16, 2025).

5.      As a result of Defendants' failure to protect the sensitive information they were entrusted to safeguard, Plaintiffs and Class Members have already suffered harm and have been exposed to a significant and continuing risk of identity theft, financial fraud, and other identity-related fraud for years to come.

## PARTIES

6.      Plaintiff Kevin Chinchilla Montero is an adult, who at all relevant times, is and was a citizen of the State of California. Plaintiff Chinchilla Montero is a member of Blue Shield.

7.      Plaintiff Emily Desley-Bloom is an adult, who at all relevant times, is and was a citizen of the State of California. Plaintiff Desley-Bloom is a member of Blue Shield.

8.      Plaintiff James Kelly is an adult, who at all relevant times, is and was a citizen of the State of Vermont. Plaintiff Kelly is a former member of Blue Shield.

9.      Plaintiff Brianna Martin is an adult, who at all relevant times, is and was a citizen of the State of South Carolina. Plaintiff Martin is a former member of Blue Shield.

10.      Plaintiff Alexandra Murillo is an adult, who at all relevant times, is and was a citizen of the State of California. Plaintiff Murillo is a former member of Blue Shield.

11.    Plaintiff Ann Wasserman is an adult, who at all relevant times, is and was a citizen of the State of Illinois. Plaintiff Wasserman is a former member of Blue Shield.

12.    Plaintiff Mathew Werber is an adult, who at all relevant times, is and was a citizen of the State of Washington. Plaintiff Werber is a former member of Blue Shield.

13.    Defendant Young Consulting, LLC, which now does business as Connexure,[2] is a Georgia limited liability company with its principal place of business located in Atlanta, Georgia.

14.    Defendant Blue Shield is a California corporation with its principal place of business in Sacramento, California.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because Plaintiffs and at least one member of the proposed Class are citizens of a state different from at least one Defendant, [3] the proposed Class consists

---

[2] Business Wire, *Young Consulting Rebrands to Connexure* (Apr. 22, 2024), https://www.businesswire.com/news/home/20240422938565/en/Young-Consulting-Rebrands-to-Connexure; *About Us*, Connexure, https://connexure.co/about-us/ (last visited July 16, 2025).

[3] *See* 28 U.S.C. § 1332(d)(10) (stating that for purposes of CAFA jurisdiction, an unincorporated association deemed to be citizen of State where it has its principal place of business and under whose laws it is organized).

of more than 100 members, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

16.    This Court has general personal jurisdiction over Young Consulting, as, at all relevant times, Young Consulting is headquartered in Georgia, has engaged in substantial business activities in Georgia, regularly conducts business in Georgia, and has sufficient minimum contacts in Georgia.

17.    This Court has specific personal jurisdiction over Blue Shield because it contracted with Georgia-based Young Consulting to process sensitive data. Plaintiffs' claims arise directly from that relationship and the Data Breach, which involved data handling within Georgia. Blue Shield purposefully availed itself of the privilege of conducting business in Georgia by engaging a Georgia-based vendor. Blue Shield previously invoked this Court's jurisdiction by seeking transfer of related litigation to this District.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District. Defendants conduct substantial business in this District, and the Data Breach has caused harm to Plaintiffs and Class Members residing in this District.

## FACTUAL BACKGROUND

**A.    Defendants Collected, Stored, and Failed to Safeguard Plaintiffs' and Class Members' PII and PHI.**

19.    Young Consulting, a software-as-a-service (SaaS) company now doing business as Connexure,[4] holds itself out as the "market leader in providing software solutions to the employer stop loss marketplace."[5] It provides "integrated software solutions for the marketing, underwriting and administering of medical stop loss insurance for [insurance] carriers, brokers and third party administrators" nationwide.[6] Upon information and belief, Young Consulting provides its software solutions to Blue Shield and other health insurance companies throughout the country.

20.    Blue Shield is a national health insurance carrier and an independent member of the Blue Cross Blue Shield Association. It provides coverage to approximately 4.5 million individuals and claims to be "dedicated to providing Californians with access to high-quality health care at an affordable price."[7] Blue Shield offers nationwide coverage for "100% of U.S. ZIP codes" and offers plans to

---

[4] *See supra* note 2.

[5] Young Consulting, *supra* note 1.

[6] *Id.*

[7] *About Blue Shield*, Blue Shield CA, https://www.blueshieldca.com/en/home/about-blue-shield (last visited July 16, 2025).

"California-headquartered groups and to groups with employee populations in California."[8]

21.    In the course of providing health insurance services, Blue Shield and other clients of Young Consulting collect and maintain large volumes of sensitive personal and medical information from their members, including names, dates of birth, Social Security numbers, insurance identification numbers, claims data and information, and other personally identifiable and protected health information.

22.    Plaintiffs and Class Members entrusted Blue Shield and other clients of Young Consulting with their PII and PHI in order to receive health insurance services and reasonably expected that it would be kept secure and confidential.

23.    Blue Shield explicitly acknowledges its duty to protect the privacy of members' health information. Its *Notice of Privacy Practices* states, "we understand the importance of keeping your personal information private, and we take our obligation to do so very seriously."[9]

24.    Blue Shield also represents that it "maintain[s] physical, technical, and administrative safeguards to ensure the privacy of your PHI" and that "only Blue

---

[8]*Help topics & frequently asked questions*, https://www.blueshieldca.com/en/employer/resources/help-topics-and-faqs (last visited July 18, 2025).

[9]*Blue Shield Notice of Privacy Practices*, https://www.blueshieldca.com/content/dam/bsca/en/member/docs/A52389XLB-0125-REF2361452-Notice-of-Privacy-Practices.pdf (last visited July 16, 2025).

Shield workforce members who are authorized and trained are given access to our paper and electronic records and to non-public areas where this information is stored."[10]

25.    Blue Shield also posts on its website a *HIPAA Notice of Privacy Practices*,[11] which includes the same or similar representations, and additional representations such as:

     a.   "We will obey any and all laws that require us to give you privacy protections, including HIPAA and any other federal or California privacy law."

     b.   "To the extent federal and California privacy laws set forth different standards for certain health information, we will apply the standard that affords your health information the greater degree of protection and security, unless otherwise required by law."

---

[10] *Id.*

[11] *HIPAA Notice of Privacy Practices*, Blue Shield of California (May 21, 2025), https://www.blueshieldca.com/content/dam/bsca/en/member/docs/A52389XLB-0125-REF2361452-Notice-of-Privacy-Practices.pdf. This Notice has an effective date of May 21, 2025, but on information and belief, the same or similar language was effective at the time of the Data Breach.

26.    Blue Shield's *Code of Conduct* applies to employees, business partners, and anyone working on its behalf.[12] It states: "Blue Shield collects a great deal of individually identifiable personal information ('IIPI') and protected health information ('PHI') that belongs to our members, patients, customers, business partners, and employees. Follow data privacy laws carefully as well as storage guidelines (if any) to protect it."[13]

27.    The *Code of Conduct* contains instructions to, among other things, "practice safe cybersecurity," to "watch for potential cyberthreats," to "use special care with personal information and personal health information," to "recognize your responsibility to handle personal data respectfully and securely."[14]

28.    The *Code of Conduct* further states that "securing all the information we collect and create" is a key part of earning and maintaining trust.[15]

29.    The *Code of Conduct* expressly states: "***We recognize that privacy is a basic human right****. That is why we respect the personal information we collection, handling it with care, and following all laws designed to protect it.*"[16]

---

[12] *Blue Shield Code of Conduct*, https://www.blueshieldca.com/content/dam/bsca/en/shared/documents/2024/BSCA-Code-of-Conduct-EXT-2024.pdf (last visited July 16, 2025).

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* (emphasis added).

30.    Blue Shield also maintains a *Supplier Code of Conduct*, which imposes clear and specific obligations on its vendors regarding the handling of sensitive information. It requires vendors to uphold "the highest standards of ethical conduct and management practices," including those relating to privacy and compliance.[17]

31.    These obligations include that suppliers "implement and maintain, as applicable, management systems that facilitate ongoing compliance with this Code and all applicable laws," including providing "privacy training and education, on a continuous basis, to all workers and any third-parties who provide products and/or services to Blue Shield."[18]

32.    The *Supplier Code of Conduct* further mandates that suppliers are responsible for "protecting the confidentiality, and maintaining the security, of all individually identifiable personal information and/or company confidential information" they collect, access, or use while acting on behalf of Blue Shield. This includes PHI under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq*. ("HIPAA") and other sensitive data protected by federal and state law.[19]

---

[17] *Blue Shield Supplier Code of Conduct*, https://www.blueshieldca.com/content/dam/bsca/en/member/docs/Supplier-Code-of-Conduct-Sept1-2019-APR-2023.pdf (last visited July 16, 2025).

[18] *Id*.

[19] *Id*.

33.    The *Supplier Code of Conduct* identifies suppliers and their subcontractors that access, use, or maintain PHI on behalf of Blue Shield as "Business Associates" under HIPAA, requiring them to fully comply with applicable HIPAA regulations. These suppliers are required to execute a Business Associate Agreement and Security Addendum with Blue Shield and must also ensure that any subcontractor with access to PHI does the same.[20]

34.    The *Supplier Code of Conduct* also mandates that suppliers protect Blue Shield's "confidential and proprietary information," including information relating to members, associates, and government contracts.[21]

35.    Blue Shield places the burden of compliance accountability on its suppliers, requiring them to designate compliance officers and ensure that senior leadership "regularly, and on an ongoing basis," assesses the effectiveness of their privacy and compliance programs. Suppliers must also ensure that any subcontractors adhere to the same standards imposed by the *Supplier Code of Conduct* and by contract with Blue Shield.

36.    Plaintiffs allege on information and belief that Young Consulting accessed, used, and maintained PHI and PII on behalf of Blue Shield and was therefore a Business Associate subject to the obligations imposed by HIPAA and

---

[20] *Id.*

[21] *Id.*

Blue Shield's internal policies. As such, Young Consulting was required to comply with HIPAA, enter into a Business Associate Agreement and Security Addendum, and implement appropriate privacy and security safeguards consistent with Blue Shield's *Supplier Code of Conduct*.

37.    Despite these obligations, Blue Shield failed to adequately vet or oversee Young Consulting's data security practices, in violation of its own policies requiring vendors to comply with HIPAA and maintain robust privacy protections. Blue Shield also failed to verify whether Young Consulting had implemented the required privacy training, risk management systems, and contractual safeguards outlined in its *Supplier Code of Conduct*.

38.    Blue Shield's failure to ensure that its vendor adhered to basic privacy and security practices—despite its public commitments and legal obligations—constitutes a breach of its own policies and directly contributed to the exposure of Plaintiffs' and Class Members' sensitive information.

39.    Young Consulting, for its part, failed to comply with the privacy, security, and operational requirements imposed by HIPAA, industry standards, its contractual obligations as a Business Associate, and the standards set forth in Blue Shield's *Supplier Code of Conduct*.

40.    In addition, Blue Shield was a party to the California Health and Human Services Data Exchange Framework: Single Data Sharing Agreement the

("DSA").[22] Blue Shield was obligated to, among other things, "maintain[] a secure environment that supports the exchange of PHI or PII…" (DSA, at 4), and to require "Third-Party Technology vendors to (i) provide reliable, stable, and secure services to the Participant and (ii) to adhere to the same or similar privacy and security standards applicable to the Participant…" (DSA, at 7).[23]

41.    Young Consulting itself advertises that certain of its offerings are "secure" in the following ways:

    a.    "Our clients choose Connexure because our solutions are integrated, efficient, and secure. We run on cloud-based software and secure our data through SOC II audits, penetration testing, and MFR."[24]

    b.    "As self-funded options become more complex every day, Connexure offers secure and accessible processes for underwriting, administration, communication, and reporting."[25]

---

[22] *See* 2023 Mission Report, available at https://www.blueshieldca.com/content/dam/bsca/en/member/docs/Blue-Shield-of-California-2023-Mission-Report.pdf.

[23] *See* California Health and Human Services Data Exchange Framework: Single Data Sharing Agreement, available at https://www.cdii.ca.gov/wp-content/uploads/2023/01/1.-CalHHS_DSA_Final_v1_7.1.22-11.8.22.pdf.

[24] *Mission, Vision, & Values*, Connexure, https://connexure.co/about-us/mission-vision-values/ (last visited July 21, 2025).

[25] *Our Customers*, Connexure, https://connexure.co/customers/ (last visited July 21, 2025).

c.   "Xchangecentre is a secure communications portal for sending claims, claim notices and requests … All data is encrypted and password protected in compliance with HIPAA and EPHI Privacy Requirements." [26]

d.   "All Transactions sent to xchangecentre are sent and stored encrypted in a database behind multiple firewalls with active scans for detecting intrusion attempts. All access is logged by user and date. Carriers manage their own user's access to xchangecentre … The carrier can restrict user access to each exchange transaction set to ensure the safety and privacy of Ephi." [27]

e.    "BenefitConnect provides a secure real-time connection between TPAs, carriers and MGUs …"[28]

f.   "BenefitConnect is a cloud based software solution accessed via the web …. Each TPA will be set-up with their own segregated, secure and encrypted database with never any co-mingling of

---

[26] *XCHANGECENTRE*, Young Consulting,
https://www.youngconsulting.com/xchangecentre/ (last visited July 21, 2025).
[27] *Id.*
[28] *Benefit Connect*, Young Consulting,
https://www.youngconsulting.com/BenefitConnect/ (last visited July 21, 2025).

data with others." [29]

g.    For BenefitConnect, "Submit Specific 50% and trigger diagnosis notifications, claims, and appeals directly to the carrier or MGU securely without the hassle of maintaining an FTP site or third party secure E-Mail."[30]

h.    "ESLOffice is a cloud based software solution accessed via the web …. Each carrier will be set-up with their own segregated, secure and encrypted database with never any co-mingling of data with others." [31]

i.    "By connecting carriers, brokers, and TPAs through our solutions, we help better secure member data and reduce friction from continuous email communications."[32]

42.    Young Consulting did not implement reasonable and appropriate administrative, technical, and physical safeguards to protect the sensitive data it received and maintained on behalf of Blue Shield.

---

[29] *Id.*

[30] *Claim Reporting & Recovery*, Connexure, https://connexure.co/solutions/benefitconnect/claim-reporting-and-recovery/ (last visited July 21, 2025).

[31] *ESL Office*, Young Consulting, https://www.youngconsulting.com/esl-office/ (last visited July 21, 2025).

[32] *Carriers*, Connexure, https://connexure.co/customers/carriers/ (last visited July 21, 2025).

43.     As a result of Blue Shield's failure to vet and monitor its vendor, and Young Consulting's failure to comply with its privacy and security obligations, Plaintiffs' and Class Members' sensitive personal and health information was accessed and stolen by cybercriminals.

**B.     The Data Breach.**

44.     On August 26, 2024, Young Consulting posted a notice of the Data Breach on its website and began filing notifications with the appropriate authorities.[33] On the same day, Blue Shield also posted a notice on its website, directing affected individuals to Young Consulting's notice.[34]

45.     Around that time, Young Consulting began mailing notification letters (the "Notice Letter") to affected individuals on behalf of Blue Shield and other clients. In the letter, Young Consulting stated it was providing notice "on behalf of Blue Shield of California ('Blue Shield') and/or other covered entities."[35]

46.     The Notice Letter described the breach as follows:

> On April 13, 2024, Young Consulting became aware of technical difficulties in our computer environment. We immediately took certain systems offline to contain the incident and launched an

---

[33] *Notice Letter*, https://youngconsulting.com/notice/youngconsulting-notice.html (last visited July 16, 2025).

[34] *Young Consulting, Inc. Notifies Blue Shield of California Regarding a Cyber Security Incident*, Blue Shield CA (Aug. 26, 2024), https://news.blueshieldca.com/2024/08/26/young-consulting-inc-notifies-blue-shield-of-california-regarding-a-cyber-security-incident (last visited July 16, 2025).

[35] *Notice Letter*, *supra* note 34.

investigation, with the assistance of a cybersecurity forensics firm, to determine the nature and scope of the event. The investigation determined that an unauthorized actor gained access to Young Consulting's network between April 10, 2024, and April 13, 2024, and downloaded copies of certain files.[36]

47.    Young Consulting acknowledged that the compromised information "includes your name, Social Security number, date of birth, and insurance claim information."[37] However, the Notice Letter failed to define or explain the scope of "insurance claim information," which could include diagnoses, treatment details, prescription data, and other highly sensitive health-related content.

48.    The Notice Letter also omitted other critical details, including the specific nature of the cyberattack, the identity of the perpetrators, and any technical information about how the breach occurred. However, in early May 2024, a ransomware group known as BlackSuit publicly claimed responsibility for the Data Breach.[38]

49.    On its dark web "leak site," BlackSuit published a post stating that Young Consulting had refused to negotiate, even after being issued an ultimatum. It claimed to have stolen extensive categories of data, including:

---

[36] *Id.*

[37] *Id.*

[38] Ionut Arghire, *950,000 Impacted by Young Consulting Data Breach*, SecurityWeek (Aug. 28, 2024), https://www.securityweek.com/950000-impacted-by-young-consulting-data-breach/ (last visited July 16, 2025).

(1)     Business data (e.g., contracts, contacts, planning documents, presentations);

(2)     Employee data (e.g., passports, contracts, contacts, family details, medical examinations);

(3)     Financial data (e.g., audits, reports, payments, contracts); and

(4)     Other data from shared and personal folders.[39]

50.     A screenshot of the post from BlackSuit's leak site is copied below:



---

[39] *Id.*; Screenshot of BlackSuit's dark web post claiming responsibility for the Data Breach, Ionut Arghire, *950,000 Impacted by Young Consulting Data Breach*, SecurityWeek (Aug. 28, 2024).

51.    In its post, BlackSuit stated that Young Consulting's senior management "completely refused to negotiate thinking that we are bluffing." The group issued an ultimatum, threatening to release the stolen data publicly if Young Consulting did not contact them within 72 hours.[40]

52.    BlackSuit ultimately followed through with its threat and made the stolen data available for download on the dark web, exposing Plaintiffs' and Class Members' information to malicious actors worldwide.[41]

53.    As of the date of this filing, BlackSuit's leak site remains publicly accessible, and the stolen data is still available for download. Also available is a directory listing each stolen file by name, making it easy for bad actors to locate and exploit specific information. Given the duration of exposure, it is likely that the stolen data has already been downloaded hundreds, if not thousands, of times.

54.    Although Young Consulting has not publicly disclosed the precise scope of the "insurance claim information" that was compromised in the Data Breach, the nature of health insurance claims data and the services Young Consulting performs strongly indicate that the exposed PHI included several categories of highly sensitive and detailed medical information, including but not limited to:

---

[40] Arghire, *supra* note 39.

[41] *Id.*

(1)    Diagnosis codes, also known as International Classification of Diseases ("ICD") codes, which reveal the specific medical conditions or diseases diagnosed by a healthcare provider;

(2)    Procedure codes, also known as Current Procedural Terminology ("CPT") codes, which are a standardized coding system used throughout the U.S. healthcare system to document medical services, diagnostic tests, surgical procedures, physical examinations, laboratory testing, imaging, and other treatments or evaluations performed by medical professionals;

(3)    Names of physicians or healthcare providers visited;

(4)    Dates of medical treatment or services rendered; and

(5)    Medication and prescription details, including drug names, dosages, and prescribing providers.

55.    ICD codes are assigned to every disease, condition, or health encounter and serve as the standardized language through which the medical community globally communicates diagnoses and treatments. These codes allow for consistent documentation, analysis, and tracking of diseases and health conditions.

56.    Accounting for the specificity reflected in the coding process, the most recent revision of the ICD Code contains more than 72,000 diagnosis codes that can reveal extremely sensitive information about an individual, including mental and behavioral health conditions, communicable and sexually transmitted infections, substance use disorders, and chronic, degenerative, or terminal illnesses. These codes are readily searchable via numerous online public databases, enabling anyone

with access to the exposed ICD codes to instantly identify the specific conditions or diagnoses associated with an individual.

57.    Whether Young Consulting refused to engage with the hackers or attempted to pay a ransom in hopes of securing deletion, such actions offer no meaningful assurance. As cybersecurity journalist Brian Krebs has noted, ransomware operators have no incentive to destroy valuable information that may be monetized in the future:

> Companies hit by ransomware often face a dual threat: Even if they avoid paying the ransom and can restore things from scratch, about half the time the attackers also threaten to release sensitive stolen data unless the victim pays for a promise to have the data deleted. Leaving aside the notion that victims might have any real expectation the attackers will actually destroy the stolen data, new research suggests a fair number of victims who do pay up may see some or all of the stolen data published anyway.[42]

58.    On August 26, 2024, Young Consulting reported to the Maine Attorney General's Office that the breach affected 954,177 individuals.[43]

59.    On April 11, 2025, Young Consulting increased that number to

---

[42] Brian Krebs, *Why Paying to Delete Stolen Data is Bonkers*, Krebs on Security (Nov. 4, 2020), https://krebsonsecurity.com/2020/11/why-paying-to-delete-stolen-data-is-bonkers/ (last visited July 16, 2025).

[43] *Maine Attorney General, Data Breach Notifications* (August 26, 2024), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/9cb5e8fe-3d04-48e5-a403-d478cdaf5c7f.html (last visited July 16, 2025).

1,020,108 individuals.[44]

60.    On July 2, 2025, it increased the total again, reporting that 1,071,336 individuals had been affected.[45] It remains unclear whether this number will continue to increase or what proportion of affected individuals have received formal notice.

61.    Aside from Blue Shield, Young Consulting has not publicly identified any of its other clients whose data has been compromised in the breach.

**C.    The Data Breach was Foreseeable and Preventable.**

62.    Organizations operating in the healthcare and health-related sectors have long been recognized as high-value targets for cybercriminals. These entities collect and store vast amounts of sensitive information—including patients' financial data, login credentials, insurance details, medical records, diagnoses, and employees' personal information—all of which command high prices on underground markets.

63.    In response to growing cybersecurity threats, the Federal Bureau of Investigation ("FBI"), the Cybersecurity and Infrastructure Security Agency

---

[44] *Maine Attorney General, Data Breach Notifications* (April 11, 2025), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/d47b8998-f086-4011-ba02-32093d5216ae.html (last visited July 16, 2025).

[45] *Maine Attorney General, Data Breach Notifications* (July 2, 2025), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/c0ada3e2-cffc-46f9-9690-7db0a89c5d06.html (last visited July 16, 2025).

("CISA"), and the U.S. Department of Health and Human Services ("HHS") issued a Joint Cybersecurity Advisory in October 2020 warning U.S. healthcare entities of a "credible and imminent cybercrime threat" and urging immediate implementation of robust, layered security defenses.[46]

64.    Data breaches and identity theft have surged in recent years, creating growing economic consequences for individuals, businesses, and government entities. In 2023 alone, there were 6,077 recorded breaches exposing more than 17 billion records—representing a 19.8% year-over-year increase in the United States compared to 2022.[47] This trend is mirrored in identity theft complaints, which nearly doubled over a four-year span—from 2.9 million reports in 2017 to 5.7 million in 2021.[48]

---

[46] Joint Cybersecurity Advisory, *Ransomware Activity Targeting the Healthcare and Public Health Sector* (October 28, 2020), https://www.cisa.gov/sites/default/files/publications/AA20-302A_Ransomware%20_Activity_Targeting_the_Healthcare_and_Public_Health_Sector.pdf (last visited July 16, 2025).

[47] Flashpoint, *2024 Global Threat Intelligence Report*, (Feb. 29, 2024), https://go.flashpoint.io/2024-global-threat-intelligence-report-download (last visited July 16, 2025).

[48] Insurance Information Institute, *Facts & Statistics: Identity Theft and Cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited July 16, 2025).

65.    The healthcare industry has become a primary target for cybercriminals due to a combination of high-value data and outdated infrastructure.[49]

66.    In fact, "[a]n unwanted record was set in 2023 with 725 large security breaches in healthcare reported to the Department of Health and Human Services Office for Civil Rights, beating the record of 720 healthcare security breaches set the previous year."[50]

67.    Recent statistics confirm that data breaches concerning medical records and/or healthcare have been on a steady upward trend for over a decade. According to the *HIPAA Journal*, these incidents have increasingly involved millions of affected patients.[51] High-profile breaches at healthcare providers and related service companies in recent years include: Change Healthcare, Inc. (affecting 190 million individuals in 2024); Anthem, Inc. (affecting 78.8 million individuals in 2015); American Medical Collection Agency (affecting more than twenty-six million individuals in 2019); Welltok, Inc. (affecting 14.7 million individuals in 2023);

---

[49] SwivelSecure, *9 Reasons Why Healthcare is The Biggest Target for Cyberattacks*, https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited July 16, 2025).

[50] Steve Alder, *Security Breaches in Healthcare in 2023*, The HIPAA Journal (Jan. 31, 2024), https://www.hipaajournal.com/wp-content/uploads/2024/01/Security_Breaches_In_Healthcare_in_2023_by_The_HIPAA_Journal.pdf (last visited July 16, 2025).

[51] The HIPAA Journal, *Healthcare Data Breach Statistics* (July 15, 2025), https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last visited July 16, 2025).

Premera Blue Cross (affecting eleven million individuals in 2015); CareSource (affecting more than three million individuals in 2023); Perry Johnson & Associates, Inc. (affecting 9.3 million people in 2023); Excellus Health Plan, Inc. (affecting ten million individuals in 2015); and many more.[52]

68.　One of the most prominent and rapidly growing threats in this landscape is the ransomware group BlackSuit. Since its emergence in May 2023, BlackSuit has attacked at least 95 organizations globally—many in healthcare, education, public administration, and related industries. Experts believe the true number of victims is significantly higher, as many attacks go unreported or undisclosed.[53]

69.　BlackSuit is widely believed to be a spinoff of the Royal and Conti ransomware groups and is linked to Russian and Eastern European threat actors. It employs "double extortion" tactics—encrypting files while simultaneously stealing sensitive data to pressure victims into paying ransom under threat of public exposure.[54]

70.　In a June 2024 joint cybersecurity advisory, CISA, the FBI, and the National Security Agency ("NSA") warned that BlackSuit attacks were increasing

---

[52] *Id.*

[53] Darktrace Blog, *Tactics Behind the Royal and Blacksuit Ransomware* (Nov. 13, 2024), https://www.darktrace.com/blog/from-royal-to-blacksuit-understanding-the-tactics-and-impact-of-a-sophisticated-ransomware-strain (last visited July 16, 2025).

[54] *Id.*

in frequency, scale, and technical sophistication, and the group was targeting U.S. entities that lack adequate cybersecurity defenses.[55]

71. CISA and other agencies have repeatedly emphasized that organizations can significantly reduce the risk of ransomware by implementing widely accepted cybersecurity practices, including:

(1)  User education to help employees identify phishing emails and spoofing attempts;

(2)  Multi-factor authentication ("MFA") to prevent unauthorized access even if credentials are stolen;

(3)  Network segmentation to contain attacks and limit lateral movement;

(4)  Principle of least privilege ("POLP") to restrict user access only to the data necessary for their roles;

(5)  Vulnerability scanning and prompt patching of internet-facing software;

(6)  Secure configuration of RDP and VPN access;

(7)  Server Message Block ("SMB") protocol hardening; and

(8)  Use of centrally managed antivirus and intrusion detection systems.[56]

---

[55] CISA, *#StopRansomware: Blacksuit (Royal) Ransomware* (August 27, 2024), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-061a (last visited July 16, 2025).

[56] CISA Ransomware Guide (Sept. 2020), https://www.cisa.gov/sites/default/files/publications/CISA_MS-ISAC_Ransomware%20Guide_S508C_.pdf (last visited July 16, 2025).

72.     For example, if a malicious actor gains access to an employee's login credentials, MFA can still prevent unauthorized login. Likewise, effective network segmentation can stop attackers from moving laterally across databases and encrypting critical systems. When properly implemented, such measures substantially mitigate the risk of a full-scale ransomware attack.

73.     Despite holding the PII and PHI of over one million individuals, Young Consulting failed to implement some or all of these well-established security controls. Similarly, Blue Shield failed to exercise adequate oversight of its vendor, despite publicly asserting that it imposes strict data security and compliance obligations on third-party partners.

**D.     Defendants are Subject to and Failed to Comply with HIPAA.**

74.     HIPAA establishes security provisions and data privacy responsibilities designed to keep individuals' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[57]

---

[57] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

75.    HIPAA requires the implementation of comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PHI.[58]

76.    HIPAA applies to two types of entities: "covered entities," such as healthcare providers, health plans, or healthcare clearinghouses; and "business associates," who are contracted by covered entities to assist in performing healthcare-related functions. *See* 45 C.F.R. § 160.103.

77.    Upon information and belief, Young Consulting is a "business associate" subject to HIPAA because it receives, maintains, and electronically transmits PHI from health plans such as Blue Shield to assist in carrying out healthcare-related functions.[59]

78.    Blue Shield qualifies as a "covered entity" under HIPAA because it operates as a health plan.

79.    HIPAA requires Defendants to implement adequate safeguards to prevent the unauthorized use or disclosure of PHI, including compliance with the

---

[58] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

[59] *See* 45 C.F.R. § 160.103; *see also* Office for Civil Rights, *Business Associates*, U.S. Dep't of Health & Hum. Servs. (May 24, 2019), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/business-associates/index.html (a third-party administrator is listed as a typical type of business associate under HIPAA).

HIPAA Security Rule.[60] They are also obligated to report any unauthorized access or disclosure of PHI, including incidents involving breaches of unsecured PHI—such as the Data Breach at issue in this case.[61]

80.    These requirements include: (a) ensuring the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identifying and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protecting against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensuring compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et seq*.; *see also* 45 C.F.R. § 164.308 (administrative safeguards).

81.    The Department of Health and Human Services Office for Civil Rights recommends the following data security measures that covered entities and business associates like Defendants should implement to protect against common cyber-attack techniques:

(1)    Regulated entities should implement security awareness and training for all workforce members and that the training programs should be

---

[60] The HIPAA Security Rule establishes national standards to protect individuals' electronic personal health information that is created, received, used, or maintained by a covered entity. The Security Rule requires appropriate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information. *See* 45 C.F.R. Part 160 and Part 164, Subparts A and C.

[61] *See* Breach Notification Rule, 45 C.F.R. §§ 164.400–414.

ongoing, and evolving to be flexible to educate the workforce on new and current cybersecurity treats and how to respond;

(2)    Regulated entities should implement technologies that examine and verify that received emails do not originate from known malicious sites, scan web links or attachments included in emails for potential threats, and impeded or deny the introduction of malware that may attempt to access PHI;

(3)    Regulated entities should mitigate known data security vulnerabilities by patching or upgrading vulnerable technology infrastructure, by upgrading or replacing obsolete and/or unsupported applications and devices, or by implementing safeguards to mitigate known vulnerabilities until an upgrade or replacement can occur;

(4)    Regulated entities should implement security management processes to prevent, detect, contain, and correct security violations, including conducting risk assessments to identify potential risks and vulnerabilities to the confidentiality, integrity, and availability of PHI; and

(5)    Regulated entities should implement strong cyber security practices by requiring strong passwords rules and multifactor identification.[62]

82.    Due to the nature of their businesses, Defendants cannot conduct regular operations without collecting and maintaining individuals' PHI—information they know to be highly sensitive and confidential.

83.    Despite their duty to safeguard Plaintiffs' and Class Members' PHI, Defendants failed to employ adequate data security measures, including some or all

---

[62] *OCR Quarter 1 2022 Cybersecurity Newsletter*, U.S. Dep't Health & Human Services, (Mar. 17, 2022), https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity-newsletter-first-quarter-2022/index.html.

of the measures set forth above. As a result, highly sensitive and confidential information was exposed in the Data Breach.

**E.    Defendants Failed to Comply with FTC Guidelines.**

84.    Defendants are prohibited by the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45 from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

85.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[63]

86.    In 2016, the FTC updated its publication titled Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.[64] The guidelines recommend that businesses implement the following:

---

[63] *See* Federal Trade Commission, *Start with Security: A Guide for Business*, https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business (last visited July 16, 2025).

[64] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited July 16, 2025).

(1)    Businesses should promptly dispose of personal identifiable information that is no longer needed, and retain sensitive data "only as long as you have a business reason to have it;"

(2)    Businesses should encrypt sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

(3)    Businesses should thoroughly understand the types of vulnerabilities on their network and how to address those vulnerabilities;

(4)    Businesses should install intrusion detection systems to promptly expose security breaches when they occur; and

(5)    Businesses should install monitoring mechanisms to watch for large troves of data being transmitted from their systems.[65]

87.    In another publication, the FTC recommended that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[66]

88.    Notably, the FTC treats the failure to employ reasonable data security safeguards as an unfair act or practice prohibited by Section 5 of the FTC Act. Indeed, the FTC has brought enforcement actions against businesses for failing to

---

[65] *Id.*

[66] *See Start with Security: A Guide for Business*, Federal Trade Commission (June 2015), available at https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business.

adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

89.    Upon information and belief, Defendants failed to properly implement one or more of the basic data security practices recommended by the FTC. Defendants' failure to employ reasonable and appropriate data security measures to protect against unauthorized access to individuals' PII and PHI constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

90.    Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[67]

91.    NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security

---

[67] National Institute of Standards and Technology, *Framework for Improving Critical Infrastructure Cybersecurity*, National Institute of Standards & Technology (Apr. 16, 2018), App'x A, Table 2, https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf (last visited July 16, 2025).

controls, network monitoring, breach detection, and incident response.[68] Upon information and belief, Defendants failed to adhere to the NIST guidance.

92.    Defendants were well aware of their obligations to use reasonable measures to protect individuals' PII and PHI. Defendants also knew that Young Consulting was a target for hackers, as discussed above. Despite understanding the risks and consequences of maintaining inadequate data security, Defendants nevertheless failed to comply with their data security obligations, leading to the compromise of Plaintiffs' and Class Members' PII and PHI.

**F.    Defendants Knew the Risks of Storing Valuable PII and PHI.**

93.    At all relevant times, Young Consulting and Blue Shield were aware that the PII and PHI they collected, maintained, created, and exchanged was highly sensitive and of significant value to bad actors seeking to misuse it.

94.    Young Consulting and Blue Shield also knew that a breach of Young Consulting's systems—and the resulting exposure of the sensitive information stored therein—posed a serious risk of identity theft, financial fraud, and other harm to affected individuals, as well as intrusion into their highly private health information.

95.    PII and PHI have considerable monetary value and are a well-known targets for cybercriminals. Hackers can easily sell stolen data, as there has been a

---

[68] *Id.* at Table 2, 26-43.

"proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[69]

96.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiffs and Class Members especially vulnerable to medical fraud, identity theft, tax fraud, credit and bank fraud, and more.

97.    **Social Security numbers**: Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Social Security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

98.    The Social Security Administration warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have

---

[69] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last visited July 16, 2025).

records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

If you receive a new Social Security Number, you should not be able to use the old number anymore.

For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make it more difficult for you to get credit.[70]

99.    Social Security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often Social Security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes Social Security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

100.    **Health Insurance Information**: "stolen personal health insurance information can be used by criminals to obtain expensive medical services, devices

---

[70] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited July 16, 2025).

and prescription medications, as well as to fraudulently acquire government benefits like Medicare or Medicaid."[71]

101.    In fact, there are even guides, tutorials, and documentation available on the dark web to assist novice cybercriminals in conducting health insurance fraud.[72]

102.    This type of fraud, known as medical identity theft, can be hard to spot and even harder to recover from— "[t]he average person may have no idea a problem like this can arise until long after a theft occurs."[73]

103.    As Eva Velasquez, president and CEO of the Identity Theft Resource Center, explains, a "majority of victims find out when they're trying to move on with their lives, if bills have gone to collections."[74] Additionally, as cybersecurity experts at the American Hospital Association have noted:

> [T]he personal information in people's medical records may be sold in bulk to criminals who create phony providers to submit fraudulent claims on a mass scale that can result in hundreds of millions of dollars in Medicaid, Medicare, or other insurance

---

[71] Forbes, *Why Cyber-Criminals Are Attacking Healthcare—And How To Stop Them*, Forbes (Oct. 5, 2018), https://www.forbes.com/sites/kateoflahertyuk/2018/10/05/why-cyber-criminals-are-attacking-healthcare-and-how-to-stop-them/?sh=54e8ed1e7f69 (last visited July 16, 2025).

[72] Dark Owl, *Unveiling Insurance Fraud on the Dark Web* (Apr. 25, 2024), https://www.darkowl.com/blog-content/unveiling-insurance-fraud-on-the-dark-web/ (last visited July 16, 2025).

[73] Michelle Andrews, *Someone Could Steal Your Medical Records and Bill You for Their Care*, NPR (July 26, 2023), https://www.npr.org/sections/health-shots/2023/07/26/1189831369/medical-identity-fraud-protect-yourself (last visited July 16, 2025).

[74] *Id.*

fraud. Or they may use the information to create fake identities to apply for loans, mortgages, or credit cards.[75]

104.   Medical identity theft causes tens of billions of dollars in losses annually.[76]

105.   According to a *Reuters* investigation based on interviews with nearly a dozen healthcare executives, cybersecurity investigators, and fraud experts, medical data sold on underground markets "includes names, birth dates, policy numbers, diagnosis codes and billing information."[77] Fraudsters commonly use this data "to create fake IDs to buy medical equipment or drugs that can be resold, or they combine a patient number with a false provider number and file made-up claims with insurers."[78]

106.   Tom Kellermann, chief cybersecurity officer at cybersecurity firm Carbon Black, explains: "Health information is a treasure trove for criminals [because] by compromising it, by stealing it, by having it sold, you have seven to 10

---

[75] *Id.*

[76]   FBI, *Health Care Fraud*, https://www.fbi.gov/investigate/white-collar-crime/health-care-fraud (last visited July 16, 2025).

[77] Reuters, *Your Medical Record is Worth More to Hackers Than Your Credit Card* (Sept. 24, 2014), https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924 (last visited July 16, 2025).

[78] *Id.*

personal identifying characteristics of an individual."[79]

107.    As noted by Paul Nadrag, a software developer at medical device integration firm Capsule Technologies, the high value of medical data stems from its permanence and range of sensitive details:

> The reason for this price discrepancy—like any other good or service—is perceived value. While a credit card number is easily canceled, medical records contain a treasure trove of unalterable data points, such as a patient's medical and behavioral health history and demographics, as well as their health insurance and contact information. Once records are stolen, cybercriminals often tap into members of a criminal network on the dark web experienced in drug trafficking and money laundering who are eager to buy medical records to support their criminal activities, such as illegally obtaining prescription medications, filing bogus medical claims or simply stealing the patient's identity to open credit cards and fraudulent loans.[80]

108.    Exacerbating the problem, victims of medical identity theft oftentimes struggle to resolve the issue because HIPAA regulations require the victim to be personally involved in the resolution of the crime.[81] In some cases, victims may not

---

[79] Andrew Steger, *What Happens to Stolen Healthcare Data?* (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last visited July 16, 2025).

[80] Fierce Healthcare, *Industry Voices—Forget credit card numbers. Medical records are the hottest items on the dark web* (Jan. 26, 2021), https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-are-hottest-items-dark-web (last visited July 16, 2025).

[81] Ponemon Institute, *Fifth Annual Study on Medical Identity Theft* (Feb. 2015), https://static.nationwide.com/static/2014_Medical_ID_Theft_Study.pdf?r=65 (last visited July 16, 2025).

even be able to access medical records using their personal information because they include a false name or data points taken from another person's records. Consequently, only 10% of medical identity theft victims responded that they "achiev[ed] a completely satisfactory conclusion of the incident."[82]

109.    Moreover, it can take months or years for victims to even discover they are the victim of medical-related identity theft or fraud given the difficulties associated with accessing medical records and healthcare statements. For example, the FTC notes that victims may only discover their identity has been compromised after they:

- Receive a bill for medical services they did not receive;
- Get contacted by a debt collector about medical debt they do not owe;
- See medical collection notices on their credit report that they do not recognize;
- Find erroneous listings of office visits or treatments on their explanation of benefits (EOB);
- Receive information from their health plan that they have reached their limit on benefits; or
- Be denied insurance because their medical records show a condition they do not have.[83]

---

[82] *Id*.

[83] Federal Trade Commission, *Medical Identity theft FAQs for Health Care Providers and Health Plans*, https://www.ftc.gov/system/files/documents/plain-language/bus75-medical-identity-theft-faq-health-care-health-plan.pdf (last visited July 16, 2025).

110. Perhaps the most dangerous consequence of medical identity theft is the risk of misdiagnosis or improper treatment. Ann Patterson, a senior vice president of the Medical Identity Fraud Alliance, notes: "About 20 percent of victims have told us that they got the wrong diagnosis or treatment, or that their care was delayed because there was confusion about what was true in their records due to the identity theft."[84]

111. A Consumer Reports article titled "The Rise of Medical Identity Theft" describes real-world consequences of this threat, noting that it "isn't a hypothetical problem," and warning that "long tail on medical identity theft can create havoc in victims' lives."[85] As one example, a pregnant woman reportedly used a victim's medical identity to pay for maternity care at a nearby hospital. When the infant was born with drugs in her system, the state threatened to take the *victim's* four children away—not realizing her identity had been stolen. The victim ultimately had to submit to a DNA test to remove her name from the infant's birth certificate, but it took years to get her medical records corrected.[86]

---

[84] Consumer Reports, *The Rise of Medical Identity Theft* (Aug. 25, 2016) https://www.consumerreports.org/health/medical-identity-theft-a1699327549/ (last visited July 16, 2025).

[85] *Id.*

[86] *Id.*

112.    Other types of medical fraud include "leveraging details specific to a disease or terminal illness, and long-term identity theft."[87] Tom Kellermann notes: "Traditional criminals understand the power of coercion and extortion. By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[88] Long-term identity theft occurs when fraudsters combine a victim's data points, including publicly-available information or data points exposed in other data breaches, to create new identities, open false lines of credit, or commit tax fraud that can take years to remedy.

### G.    Plaintiffs and Class Members Suffered Damages.

113.    For the reasons mentioned above, Defendants' conduct, which allowed the Data Breach to occur, caused Plaintiffs and Class Members significant injuries and harm in several ways. Plaintiffs and members of the Class must immediately devote time, energy, and money to: (1) closely monitor their medical statements, bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications

---

[87] Andrew Steger, *What Happens to Stolen Healthcare Data?* (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last visited July 16, 2025).
[88] *Id.*

to ensure that they are not being targeted in a social engineering or spear phishing attack; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

114.    Once PII and PHI are exposed, there is virtually no way to recover the data or prevent future misuse. This is especially true here, where the information stolen during the Data Breach has been leaked on the dark web and remains available to download. As a result, Plaintiffs and Class Members must maintain heightened vigilance indefinitely. Further, Plaintiffs and Class Members have not been compensated for the unconsented and unauthorized disclosure of their PII and PHI, for which there is a robust market.

115.    As a direct result of the Data Breach, Plaintiffs and Class Members have suffered and will continue to suffer economic and other concrete harms, including but not limited to:

(1)    Unauthorized disclosure of their confidential information;

(2)    Loss of the control of their PII and PHI;

(3)    Loss of the benefit of their bargain in choosing organizations promising data protection;

(4)    Identity theft, fraud, and misuse of medical and financial information;

(5)    Out-of-pocket expenses for credit monitoring, mitigation efforts, and fraud prevention tools;

(6)    Unauthorized charges and restricted access to financial accounts;

(7)    Emotional distress, anxiety, and loss of privacy;

(8)    Time and productivity lost dealing with the consequences of the breach;

(9)    Damage to credit scores, including from fraudulent inquiries; and

(10)    Continued and imminent risk of future fraud and identity theft due to their data being in the hands of unauthorized third parties.

116.    Individuals suffer harm each time their personal data is compromised and circulated on underground markets—even if they have been affected by prior breaches. The dark web contains vast, fragmented repositories of stolen information that can be aggregated by different criminals for varied forms of fraud. Each subsequent breach increases the likelihood that a victim's sensitive data will be accessed by more actors and exploited in new and damaging ways.

117.    Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. There may also be a significant time lag between when personal information is stolen and when it is misused for fraudulent purposes.

118.    Plaintiffs and Class Members place significant value on data security and consider a company's ability to protect personal information a key factor in their purchasing decisions. Many consumers are willing to pay more for services from organizations that demonstrate strong cybersecurity practices. Conversely, consumers are far less likely to share personal data with companies that have

suffered a data breach—reflecting the reputational damage and business consequences that flow from failing to safeguard sensitive information.

119.   Because of the premium consumers place on data privacy, healthcare companies with robust security practices are viewed more favorably and can command higher prices than those that do not. Had Blue Shield's members known the truth about its lack of vendor oversight—or that it entrusted their sensitive data to an entity with inadequate security practices—they would not have enrolled in Blue Shield's plans; paid less; complained to their brokers, employers or plan sponsors; or otherwise sought alternative arrangements for health insurance. As a result, Plaintiffs and Class Members were deprived of the benefit of their bargain, having paid for secure and responsible handling of their PII and PHI but receiving substantially less in return.

120.   By collecting and storing Plaintiffs' and Class Members' sensitive information, Defendants undertook a duty to safeguard it and avoid increasing the risk of identity theft or fraud. Because Defendants failed to uphold that duty, Plaintiffs seek the present value of identity protection services and other compensatory measures to address the current and future harm stemming from the Data Breach.

121.   Additionally, Plaintiffs and Class Members are entitled to recover the reasonable use value of their PII and PHI that was accessed and exfiltrated without

authorization. This form of compensation mirrors damages awarded in intellectual property cases for unauthorized use of intangible assets. As with a patent or trade secret, PII and PHI are non-rivalrous: their unauthorized use by a third party does not eliminate the owner's ability to use them but still justifies compensation based on market value.

122.   Young Consulting's delayed and incomplete notice of the Data Breach caused additional harm to Plaintiffs and Class Members. The communication failed to disclose critical information, including the scope of the breach, the nature of the clinical information stolen, the number of individuals affected, and the identity of the threat actors. Instead, Young Consulting issued vague and unsupported reassurances, claiming it was "not aware of any evidence of identity theft or fraud occurring as a result of this incident"—despite the fact that the stolen data has remained publicly accessible on the dark web for over a year as of this filing. Many victims have likely still not received formal notice. This lack of transparency has deprived victims of the ability to take timely, informed, and proactive measures to mitigate harm caused by the Data Breach.

123.   Upon information and belief, Young Consulting and Blue Shield continue to retain the PII and PHI of all Plaintiffs and all Class Members. As long as Defendants maintain possession of this information, Plaintiffs and Class Members

46

have a strong and ongoing interest in ensuring that adequate safeguards are in place to prevent further unauthorized access or disclosure.

### H.    Plaintiffs' Experiences.

#### *Plaintiff Kevin Chinchilla Montero*

124.    Plaintiff Chinchilla Montero is a current member of Blue Shield. In order to receive health insurance services, Plaintiff Chinchilla Montero was required to provide and entrust Blue Shield with his Private Information. In turn, Blue Shield provided and entrusted Plaintiff Chinchilla Montero's Private Information to Young Consulting for risk management services. When directly and/or indirectly providing and entrusting Defendants with his Private Information, Plaintiff Chinchilla Montero reasonably expected that his Private Information would remain safe and not be accessed by unauthorized third parties.

125.    On or about August 26, 2024, Plaintiff Chinchilla Montero received a notification letter from Young Consulting stating that his Private Information entrusted to Defendants had been compromised in the Data Breach.

126.    The letter acknowledged the risk posed to Plaintiff Chinchilla Montero and his Private Information compromised as a result of the Data Breach, recommending that Plaintiff Chinchilla Montero take certain preventative actions including monitoring his accounts and credit reports and to and "remain vigilant against incidents of identity theft and fraud."

127.   Since learning about the Data Breach, Plaintiff Chinchilla Montero has taken precautions to mitigate the risk of future identity theft and fraud. These precautions include continuously checking his Credit Karma profile for potentially fraudulent activity and researching the scope of the Data Breach, much of which Plaintiff Chinchilla Montero will need to continue indefinitely to protect himself from harm resulting from the Data Breach. But for the Data Breach, Plaintiff Chinchilla Montero would not have had to engage in these time-intensive mitigation efforts.

128.   Plaintiff Chinchilla Montero values his privacy and is very concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

129.   Given the nature of the information involved and the malicious and intentional means through which the information was stolen, the Data Breach has also caused Plaintiff Chinchilla Montero to suffer imminent harm arising from a substantially increased risk of additional fraud, identity theft, financial crimes, and misuse of his Private Information. This highly sensitive information is now in the hands of criminals and has likely been leaked on the dark web as a direct and proximate result of Defendants' misconduct.

130.   The substantial risk of imminent harm and loss of privacy have also

caused Plaintiff Chinchilla Montero to suffer stress, fear, emotional distress, and anxiety.

131.    Plaintiff Chinchilla Montero has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendants' possession, is protected, and safeguarded from future breaches.

### Plaintiff Emily Desley Bloom

132.    Plaintiff Desley-Bloom is a former member of Blue Shield. In order to receive health insurance services, Plaintiff Desley-Bloom was required to provide and entrust Blue Shield with her Private Information. In turn, Blue Shield provided and entrusted Plaintiff Desley-Bloom's Private Information to Young Consulting for risk management services. When directly and/or indirectly providing and entrusting Defendants with her Private Information, Plaintiff Desley-Bloom reasonably expected that her Private Information would remain safe and not be accessed by unauthorized third parties.

133.    On or about September 30, 2024, Plaintiff Desley-Bloom received an alert from Pango Identity Defense stating that her Social Security number and name were found on the dark web as a result of the Data Breach. Because Plaintiff Desley-Bloom was not notified by Young Consulting or Blue Shield about the Data Breach, she had to research the nature and scope of the Data Breach.

134.    Upon information and belief, Plaintiff Desley-Bloom's Private Information stolen in the Data Breach has already been misused, as evidenced by alerts received through her credit monitoring service.

135.    Since learning about the Data Breach, Plaintiff Desley-Bloom has taken precautions to mitigate the risk of future identity theft and fraud. These precautions include periodically changing all of her passwords, monitoring her credit reports and medical records for any signs of medical identity theft. Plaintiff Desley-Bloom will need to continue much of this vigilance indefinitely to protect herself from harm resulting from the Data Breach. But for the Data Breach, Plaintiff Desley-Bloom would not have had to engage in these time-intensive mitigation efforts.

136.    Plaintiff Desley-Bloom values her privacy and is very concerned about the potential consequences of identity theft and fraud resulting from the Data Breach.

137.    Given the nature of the information involved and the malicious and intentional means through which Plaintiff Desley-Bloom's Private Information was stolen, the Data Breach has also caused her to suffer imminent harm arising from a substantially increased risk of additional fraud, identity theft, and financial crimes, as well as misuse of her Private Information, which may result in financial losses, damage to her credit, unauthorized medical treatment, fraudulent billing, and lost time required to rectify these issues. This highly sensitive information is now in the hands of criminals and appears to have been leaked on the dark web as a direct and

50

proximate result of Defendants' misconduct. The substantial risk of imminent harm and loss of privacy have also caused Plaintiff Desley-Bloom to suffer stress, fear, emotional distress, and anxiety.

138.   The substantial risk of imminent harm and loss of privacy has also caused Plaintiff Desley-Bloom to suffer emotional distress regarding her privacy and security.

139.   Plaintiff Desley-Bloom has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendants' possession, is protected, and safeguarded from future breaches.

### *Plaintiff James Kelly*

140.   Plaintiff Kelly is a former member of Blue Shield. In order to receive health insurance services, Plaintiff Kelly was required to provide and entrust Blue Shield with his Private Information. In turn, Blue Shield provided and entrusted Plaintiff Kelly's Private Information to Young Consulting for risk management services. When directly and/or indirectly providing and entrusting Defendants with his Private Information, Plaintiff Kelly reasonably expected that his Private Information would remain safe and not be accessed by unauthorized third parties.

141.   On or about August 26, 2024, Plaintiff Kelly received a notification letter from Young Consulting stating that his Private Information entrusted to Defendants had been compromised in the Data Breach.

142.   The letter acknowledged the risk posed to Plaintiff Kelly and his Private Information compromised as a result of the Data Breach, recommending that Plaintiff Kelly take certain preventative actions including monitoring his accounts and credit reports and to and "remain vigilant against incidents of identity theft and fraud."

143.   Since learning about the Data Breach, Plaintiff Kelly has taken precautions to mitigate the risk of future identity theft and fraud. These precautions include reviewing his personal accounts for fraudulent activity and researching the scope of the Data Breach, much of which Plaintiff Kelly will need to continue indefinitely to protect himself from harm resulting from the Data Breach. But for the Data Breach, Plaintiff Kelly would not have had to engage in these time-intensive mitigation efforts.

144.   Plaintiff Kelly values his privacy and is very concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

145.   Given the nature of the information involved and the malicious and intentional means through which the information was stolen, the Data Breach has also caused Plaintiff Kelly to suffer imminent harm arising from a substantially increased risk of additional fraud, identity theft, financial crimes, and misuse of his Private Information. This highly sensitive information is now in the hands of

criminals and has likely been leaked on the dark web as a direct and proximate result of Defendants' misconduct.

146. The substantial risk of imminent harm and loss of privacy have also caused Plaintiff Kelly to suffer stress, fear, emotional distress, and anxiety.

147. Plaintiff Kelly has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendants' possession, is protected, and safeguarded from future breaches.

### *Plaintiff Brianna Martin*

148. Plaintiff Martin is a former member of Blue Shield. In order to receive health insurance services, Plaintiff Martin was required to provide and entrust Blue Shield with her Private Information. In turn, Blue Shield provided and entrusted Plaintiff Martin's Private Information to Young Consulting for risk management services. When directly and/or indirectly providing and entrusting Defendants with her Private Information, Plaintiff Martin reasonably expected that her Private Information would remain safe and not be accessed by unauthorized third parties.

149. On or about August 26, 2024, Plaintiff Martin received a notification letter from Young Consulting stating that her Private Information entrusted to Defendants had been compromised in the Data Breach.

150. The letter acknowledged the risk posed to Plaintiff Martin and her Private Information compromised as a result of the Data Breach, recommending that

Plaintiff Martin take certain preventative actions including monitoring her accounts and credit reports and to and "remain vigilant against incidents of identity theft and fraud."

151.   Since learning about the Data Breach, Plaintiff Martin has taken precautions to mitigate the risk of future identity theft and fraud. These precautions include: temporarily freezing her credit, enrolling in credit monitoring services, and periodically reviewing account statements for fraudulent activity, much of which Plaintiff Martin will need to continue indefinitely to protect herself from harm resulting from the Data Breach. But for the Data Breach, Plaintiff Martin would not have had to engage in these time-intensive mitigation efforts.

152.   Plaintiff Martin values her privacy and is very concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

153.   Given the nature of the information involved and the malicious and intentional means through which the information was stolen, the Data Breach has also caused Plaintiff Martin to suffer imminent harm arising from a substantially increased risk of additional fraud, identity theft, financial crimes, and misuse of her Private Information. This highly sensitive information is now in the hands of criminals and has likely been leaked on the dark web as a direct and proximate result of Defendants' misconduct.

154.    The substantial risk of imminent harm and loss of privacy have also caused Plaintiff Martin to suffer stress, fear, emotional distress, and anxiety.

155.    Plaintiff Martin has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendants' possession, is protected, and safeguarded from future breaches.

### Plaintiff Alexandra Murillo

156.    Plaintiff Murillo is a former member of Blue Shield. In order to receive health insurance services, Plaintiff Murillo was required to provide and entrust Blue Shield with her Private Information. In turn, Blue Shield provided and entrusted Plaintiff Murillo's Private Information to Young Consulting for risk management services. When directly and/or indirectly providing and entrusting Defendants with her Private Information, Plaintiff Murillo reasonably expected that her Private Information would remain safe and not be accessed by unauthorized third parties.

157.    On or about September 4, 2024, Plaintiff Murillo received a notification letter from Young Consulting stating that her Private Information entrusted to Defendants had been compromised in the Data Breach.

158.    The letter acknowledged the risk posed to Plaintiff Murillo and her Private Information compromised as a result of the Data Breach, recommending that Plaintiff Murillo take certain preventative actions including monitoring her accounts

and credit reports and to "remain vigilant against incidents of identity theft and fraud."

159.  Upon information and belief, Plaintiff Murillo's Private Information stolen in the Data Breach has already been misused. Since the Data Breach, Plaintiff has received alerts through her credit monitoring services that her Private Information compromised in the Data Breach has been found on the dark web.

160.  Since learning about the Data Breach, Plaintiff Murillo has taken precautions to mitigate the risk of future identity theft and fraud. These precautions include: researching the scope of Data Breach, adding enhanced monitoring alerts to her bank account, and closely reviewing her accounts for fraudulent activity, much of which Plaintiff Murillo will need to continue indefinitely to protect herself from harm resulting from the Data Breach. But for the Data Breach, Plaintiff Murillo would not have had to engage in these time-intensive mitigation efforts.

161.  Plaintiff Murillo values her privacy and is very concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

162.  Given the nature of the information involved and the malicious and intentional means through which the information was stolen, the Data Breach has also caused Plaintiff Murillo to suffer imminent harm arising from a substantially increased risk of additional fraud, identity theft, financial crimes, and misuse of her

Private Information. This highly sensitive information is now in the hands of criminals and has likely been leaked on the dark web as a direct and proximate result of Defendants' misconduct.

163.  The substantial risk of imminent harm and loss of privacy have also caused Plaintiff Murillo to suffer stress, fear, emotional distress, and anxiety.

164.  Plaintiff Murillo has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendants' possession, is protected, and safeguarded from future breaches.

### *Plaintiff Ann Wasserman*

165.  Plaintiff Wasserman is a former member of Blue Shield. In order to receive health insurance services, Plaintiff Wasserman was required to provide and entrust Blue Shield with her Private Information. In turn, Blue Shield provided and entrusted Plaintiff Wasserman's Private Information to Young Consulting for risk management services. When directly and/or indirectly providing and entrusting Defendants with her Private Information, Plaintiff Wasserman reasonably expected that her Private Information would remain safe and not be accessed by unauthorized third parties.

166. On or about August 26, 2024, Plaintiff Wasserman received a notification letter from Young Consulting stating that her Private Information entrusted to Defendants had been compromised in the Data Breach.

57

167.    The letter acknowledged the risk posed to Plaintiff Wasserman and her Private Information compromised as a result of the Data Breach, recommending that Plaintiff Wasserman take certain preventative actions including monitoring her accounts and credit reports and to and "remain vigilant against incidents of identity theft and fraud."

168.    Upon information and belief, Plaintiff Wasserman's Private Information stolen in the Data Breach has already been misused. Since the Data Breach, Plaintiff Wasserman has received alerts through her credit monitoring services that her Private Information compromised in the Data Breach has been found on the dark web.

169.    Since learning about the Data Breach, Plaintiff Wasserman has taken precautions to mitigate the risk of future identity theft and fraud. These precautions include: reviewing her bank accounts and statements, purchasing credit monitoring services at a cost of $40, and researching the scope of the Data Breach, much of which Plaintiff Wasserman will need to continue indefinitely to protect herself from harm resulting from the Data Breach. But for the Data Breach, Plaintiff Wasserman would not have had to engage in these time-intensive mitigation efforts.

170.    Plaintiff Wasserman values her privacy and is very concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

171.   Given the nature of the information involved and the malicious and intentional means through which the information was stolen, the Data Breach has also caused Plaintiff Wasserman to suffer imminent harm arising from a substantially increased risk of additional fraud, identity theft, financial crimes, and misuse of her Private Information. This highly sensitive information is now in the hands of criminals and has likely been leaked on the dark web as a direct and proximate result of Defendants' misconduct.

172.   The substantial risk of imminent harm and loss of privacy have also caused Plaintiff Wasserman to suffer stress, fear, emotional distress, and anxiety.

173.   Plaintiff Wasserman has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendants' possession, is protected, and safeguarded from future breaches.

### *Plaintiff Mathew Werber*

174.   Plaintiff Werber is a former member of Blue Shield. In order to receive health insurance services, Plaintiff Werber was required to provide and entrust Blue Shield with his Private Information. In turn, Blue Shield provided and entrusted Plaintiff Werber's Private Information to Young Consulting for risk management services. When directly and/or indirectly providing and entrusting Defendants with his Private Information, Plaintiff Werber reasonably expected that his Private Information would remain safe and not be accessed by unauthorized third parties.

175.    On or about August 26, 2024, Plaintiff Werber received a notification letter from Young Consulting stating that his Private Information entrusted to Defendants had been compromised in the Data Breach.

176.    The letter acknowledged the risk posed to Plaintiff Werber and his Private Information compromised as a result of the Data Breach, recommending that Plaintiff Werber take certain preventative actions including monitoring his accounts and credit reports and to and "remain vigilant against incidents of identity theft and fraud."

177.    Since learning about the Data Breach, Plaintiff Werber has taken precautions to mitigate the risk of future identity theft and fraud. These precautions include: placing credit freezes with the credit bureaus, periodically monitoring his accounts for potentially fraudulent activity, and researching the scope of the Data Breach, much of which Plaintiff Werber will need to continue indefinitely to protect himself from harm resulting from the Data Breach. But for the Data Breach, Plaintiff Werber would not have had to engage in these time-intensive mitigation efforts.

178.    Plaintiff Werber values his privacy and is very concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

179.    Given the nature of the information involved and the malicious and intentional means through which the information was stolen, the Data Breach has also caused Plaintiff Werber to suffer imminent harm arising from a substantially

increased risk of additional fraud, identity theft, financial crimes, and misuse of his Private Information. This highly sensitive information is now in the hands of criminals and has likely been leaked on the dark web as a direct and proximate result of Defendants' misconduct.

180. The substantial risk of imminent harm and loss of privacy have also caused Plaintiff Werber to suffer stress, fear, emotional distress, and anxiety.

181. Plaintiff Werber has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendants' possession, is protected, and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

182. Pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3), as applicable, and/or (c)(4), Plaintiffs seek certification of the following nationwide class against Young Consulting:

> Young Consulting Nationwide Class: All persons in the United States whose Private Information was compromised in the Data Breach (also referred to herein as the "Young Consulting Class").

183. Pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3), as applicable, and/or (c)(4), Plaintiffs seek certification of the following Subclasses:

> Young Consulting California Class: All citizens of California whose Private Information was compromised in the Data Breach.

> Blue Shield Nationwide Class: All persons in the United States whose Private Information was compromised in the Data Breach and whose information originated from Blue Shield and/or was provided to Young

Consulting by Blue Shield (also referred to herein as the "Blue Shield Class.").

<u>Blue Shield California Class</u>: All citizens of California whose Private Information was compromised in the Data Breach and whose information originated from Blue Shield and/or was provided to Young Consulting by Blue Shield.[89]

184.    Specifically excluded from the Classes are Defendants and their officers, directors, or employees; any entity in which Defendants have a controlling interest; and any affiliate, legal representative, heir, or assign of Defendants. Also excluded from the Classes are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

185.    These proposed class definitions are based on the information available to Plaintiffs at this time. Plaintiffs may modify the class definitions in an amended pleading or when they move for class certification as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

186.    **Ascertainablity.** The members of the Classes are readily identifiable and ascertainable because the Classes are defined based on objective criteria.

---

[89] For the avoidance of doubt, Plaintiffs note that all members of the Young Consulting California Class, the Blue Shield Nationwide Class, and the Blue Shield California Class are likewise members of the Young Consulting Nationwide Class. Further, all members of the Blue Shield California Class are members of the Blue Shield Nationwide Class.

Defendants and/or their affiliates, among others, possess the information to identify and contact Class Members.

187. **Numerosity: Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous that joinder of all of them is impracticable. Based on Defendants' statements, the Classes contain hundreds of thousands of individuals whose Private Information was compromised in the Data Breach.

188. **Typicality: Federal Rule of Civil Procedure 23(a)(3).** As to the Classes, Plaintiffs' claims are typical of the claims of the members because all Class Members had their Private Information compromised in the Data Breach and were harmed as a result.

189. **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs will fairly and adequately protect the interests of the Class and State Subclasses. Plaintiffs have no known interest antagonistic to those of the Classes and their interests are aligned with Class Members' interests. Plaintiffs were subject to the same Data Breach as Class Members, suffered similar harms, and face similar threats due to the Data Breach. Plaintiffs have also retained competent counsel with significant experience litigating complex class actions, including Data Breach cases.

190. **Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** There are questions of law and fact common to the Classes

such that there is a well-defined community of interest in this litigation. These common questions predominate over any questions affecting only individual Class Members. The common questions of law and fact include, without limitation:

(1)   Whether Defendants owed Plaintiffs and Class Members a duty to implement and maintain reasonable security procedures and practices to protect their Private Information;

(2)   Whether Defendants acted negligently in connection with the collection, storage, monitoring and/or protection of Plaintiffs' and Class Members' Private Information;

(3)   Whether Defendants breached their duty to implement reasonable security procedures to protect Plaintiffs' and Class Members' Private Information;

(4)   Whether Defendants' breach of their duty to implement reasonable security procedures directly and/or proximately caused damages to Plaintiffs and Class Members;

(5)   Whether Defendants provided timely notice of the Data Breach to Plaintiffs and Class Members; and

(6)   Whether Plaintiffs and Class Members are entitled to compensatory damages, statutory damages, punitive damages, and/or nominal damages as a result of the Data Breach.

191.    Defendants have engaged in a common course of conduct and Plaintiffs and Class Members have been similarly impacted by Defendants' failure act reasonably in collecting and storing the Private Information and to maintain reasonable security procedures and practices to protect such information, as well as Defendants' failure to timely alert affected individuals to the Data Breach.

192.    **Superiority: Federal Rule of Civil Procedure 23(b)(3).** This class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most if not all Class Members would find the cost of litigating their individual claims prohibitively high and have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members and risk inconsistent treatment of claims arising from the same set of facts and occurrences. Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under the applicable rules.

193.    **Injunctive Relief is Appropriate under Federal Rule of Civil Procedure 23(b)(2).** Defendants have failed to take actions to safeguard Plaintiffs' and Class Members Private Information such that injunctive relief is appropriate and necessary. Defendants have acted on grounds that apply generally to the Class (and

State Subclasses) as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

## CAUSES OF ACTION

## COUNT I

### Negligence
*(On Behalf of Plaintiffs and the Young Consulting Class Against Defendant Young Consulting)*

194.   Plaintiffs repeat and reallege every allegation set forth in Paragraphs 1 through 193 above as though fully set forth herein.

195.   Unbeknownst to Plaintiffs and Class Members, Defendant Young Consulting and/or its affiliates obtained their Private Information from insurance and healthcare providers for commercial gain. Defendant Young Consulting collected and stored this Private Information for purposes of providing services to its customers and their clients.

196.   Defendant Young Consulting owed Plaintiffs and Class Members a duty to exercise reasonable care in protecting their Private Information from unauthorized disclosure or access.

197.   Defendant Young Consulting owed a duty of care to Plaintiffs and Class Members to provide adequate data security, consistent with industry standards, to ensure that its systems and networks adequately protected the Private Information.

198.   Defendant Young Consulting's duty to use reasonable care in protecting Private Information arises as a result of its relationship through healthcare and insurance providers, common law and federal law, and its own statements regarding privacy and data security. Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices.

199.   Given the sensitivity of the Plaintiffs' and Class Members' Private Information that Young Consulting collected and stored, and given the history of data breaches against other entities in the healthcare sector as described above, it was foreseeable that cybercriminals would attempt to hack Defendant Young Consulting's systems to obtain Plaintiffs' and Class Members' Private Information.

200.   Defendant Young Consulting's duty included obligations to take reasonable steps in the management of the Private Information of Plaintiffs and Class Members to prevent its disclosure and safeguard such information from theft. Young Consulting's duties included the responsibility to affirmatively design, implement, and monitor data security systems, policies, and processes to protect against reasonably foreseeable data breaches such as this Data Breach.

201.   Defendant Young Consulting was aware of and embraced its duty to exercise reasonable care in handling the Private Information of Plaintiffs and Class Members.

202.   For example, on its websites, Young Consulting touts that "Our clients choose Connexure because our solutions are integrated, efficient, and secure. We run on cloud-based software and secure our data through SOC II audits, penetration testing, and MFA [Multi-Factor Authentication]."[90] Its websites contain a number of other statements describing how its products offer secure processes; conform to HIPAA and EPHI requirements, including for encryption and password protection; allow for secure communications; monitor access and intrusion attempts; and maintain secure, segregated databases.

203.   Moreover, Defendant Young Consulting assumed a duty to exercise reasonable care in handling the Private Information of Plaintiffs and Class Members by virtue of providing services for health insurers, including but not limited to Defendant Blue Shield.

204.   For example, Defendant Blue Shield's *Code of Conduct*, which applies to (among other individuals) its employees, contractors, business partners, and "anyone else working on our behalf."[91]

205.   With response to cybersecurity and privacy, Blue Shield's *Code of Conduct* states:[92]

---

[90] *Mission, Vision, & Values*, Connexure, https://connexure.co/about-us/mission-vision-values/ (last visited July 21, 2025).

[91] *Blue Shield Code of Conduct*, *supra*, note 13, at 8.

[92] *Id.*, at 19–21.

a.    "**Practice good cybersecurity**. To prevent unauthorized access to our electronic and information assets, use our systems properly. Watch for potential cyberthreats and carefully follow our IT policies and cybersecurity rules, such as:

    i.    Create strong passwords, update them regularly, and never share them.

    ii.    Never click on suspicious links or downloads.

    iii.    Only use hardware, software, and applications that are approved by Blue Shield.

    iv.    Do not access Blue Shield information on unsecured networks, such as public Wi-Fi (for example, a hotel, café, or other public venue network). Follow our policies to protect confidential and proprietary information as well as personal information.

    v.    Contact Information Security, Risk, and Operations (ISRO) if you see or suspect unauthorized access to our systems or data.

    vi.    Follow Blue Shield's procedure to report suspicious emails. Reach out to Blue Shield's Information Security, Risk, and Operations (ISRO) for more information."

b.     "Use Special care with personal information and personal health information. Blue Shield collects a great deal of individually identifiable personal information ("IIPI") and protected health information ("PHI") that belongs to our members, patients, customers, business partners, and employees. Follow data privacy laws carefully as well as storage guidelines (if any) to protect it. To learn more, see Preserve privacy."

c.     "Preserve Privacy. ***We recognize that privacy is a basic human right***. That is why we respect the personal information we collection, handling it with care, and following all laws designed to protect it."

d.     "Know what is personal. Personal information is anything that can be used to identify someone. At Blue Shield, this can include individually identifiable personal information (IIPI), protected health information (PHI), and other sensitive information. It includes:

    i.      Name, address, phone number, or email

    ii.     Birthdate

    iii.    Social Security number

    iv.     Driver's license number

          v.        Banking or credit card information

          vi.        Medical information, including treatment, health status, and medical history

          vii.        Claims payment and benefit information

          viii.        Location data

          ix.        Company payroll data

          x.        Employee identification numbers."

e.      "Privacy is a right. We recognize that each person has a say in how their data is …

          i.        Collected

          ii.        Stored

          iii.        Used

          iv.        Deleted."

f.      "Treat personal information with respect. Recognize your responsibility to handle personal data respectfully and securely – as you would treat your own. That means collecting, accessing, and storing or disposing of personal data properly and legally. If you are aware of a possible breach of personal data, contact Blue Shield Law immediately."

g.      "Lead with integrity. When you handle personal data, ask

yourself: Am I…Carefully following our cybersecurity policies? Using personal information for true business purposes? Collecting only the information I need? Only sharing it with authorized sources? Honoring each person's privacy rights? Make sure you can answer YES to each of these questions. If you cannot, stop and seek guidance."

206.   Young Consulting knew, or in the exercise of ordinary diligence should have known, about the obligations in Blue Shield's *Code of Conduct* that it assumed.

207.   Young Consulting was also bound by Blue Shield's *Supplier Code of Conduct*, which further mandated, among other things, that suppliers are responsible for "protecting the confidentiality, and maintaining the security, of all individually identifiable personal information and/or company confidential information" they collect, access, or use while acting on behalf of Blue Shield. This includes PHI under HIPAA, 42 U.S.C. § 1320d *et seq*. and other sensitive data protected by federal and state law.[93]

208.   Blue Shield places the burden of compliance accountability on its suppliers, requiring them to designate compliance officers and ensure that senior leadership "regularly, and on an ongoing basis," assesses the effectiveness of their privacy and compliance programs. Suppliers must also ensure that any

---

[93] *Blue Shield Supplier Code of Conduct*, *supra*, note 18.

subcontractors adhere to the same standards imposed by the *Supplier Code of Conduct* and by contract with Blue Shield.

209.    In addition, Blue Shield was a party to the California Health and Human Services Data Exchange Framework: Single Data Sharing Agreement the ("DSA").[94] Blue Shield was obligated to, among other things, "maintain[] a secure environment that supports the exchange of PHI or PII…" (DSA, at 4), and to require "Third-Party Technology vendors to (i) provide reliable, stable, and secure services to the Participant and (ii) to adhere to the same or similar privacy and security standards applicable to the Participant…" (DSA, at 7).[95]

210.    Defendant Young Consulting knew, or in the exercise of ordinary diligence should have known, about Blue Shield's obligations set forth in the DSA.

211.    Further, on its website, Defendant Blue Shield posted a *Notice of Privacy Practices* with an effective date of August 16, 2013, and which is made available upon request.[96] This Notice contained a number of promises and representations regarding data security, including the following:

    a.    "At Blue Shield, we understand the importance of keeping your

_____

[94] *See* 2023 Mission Report, available at https://www.blueshieldca.com/content/dam/bsca/en/member/docs/Blue-Shield-of-California-2023-Mission-Report.pdf.

[95] *See* Single Data Sharing Agreement, *supra*, note 24. .

[96] *Notice of Privacy Practices*, *supra*, note 10.

personal information private, and we take our obligation to do so very seriously."

b.    "We are required to maintain the privacy of your PHI and to notify you in the event that you are affected by a breach of unsecured PHI."

c.    "[w]e maintain physical technical and administrative safeguards to ensure the privacy of your PHI."

d.    "Workforce members are trained on topics including: privacy and data protection policies and procedures, including:

  i.    how paper and electronic records are labeled, stored, filed and accessed.

  ii.    Physical, technical, and administrative safeguards in place to maintain the privacy and security of your PHI."

212.    Blue Shield also posts on its website a *HIPAA Notice of Privacy Practices*,[97] which includes the same or similar representations, and additional representations such as:

c.    "We will obey any and all laws that require us to give you privacy protections, including HIPAA and any other federal or California privacy law."

---

[97] *HIPAA Notice of Privacy Practices*, *supra*, note 12.

d.    "To the extent federal and California privacy laws set forth different standards for certain health information, we will apply the standard that affords your health information the greater degree of protection and security, unless otherwise required by law."

213.   Defendant Young Consulting has, by virtue of providing services for Defendant Blue Shield, among other similar insurers, assumed such obligations to store and maintain Plaintiffs' and Class Members' Private Information securely.

214.   Defendant Young Consulting was subject to an independent legal duty to exercise reasonable care in handling Plaintiffs' and Class Members' Private Information, untethered to any contract between it and either Plaintiffs or Class Members. In addition to the duties described above, the sources of Young Consulting's duties are those imposed by laws such as Section 5 of FTC Act and HIPAA, 42 U.S.C. § 1302d, *et seq.*, and its implementing regulations.

215.   Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. 15 U.S.C. § 45(a)(1).

216.   The FTC publications and orders described above also form part of the basis of Defendant Young Consulting's duty in this regard.

217.    Defendant Young Consulting violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and failing to comply with applicable industry standards, including but not limited to failing to protect against foreseeable security threats such as ransomware attacks. Defendant Young Consulting's conduct was unreasonable given the nature and amount of Private Information it obtained, stored, and disseminated in the regular course of their business, and the foreseeable consequences of a data breach, including, specifically, the significant damage that would result to Plaintiffs and Class Members.

218.    Defendant Young Consulting is an entity covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

219.    Pursuant to HIPAA, 42 U.S.C. § 1302d, *et seq.*, and its implementing regulations, Defendant Young Consulting had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiffs' and the Class Members' electronic PHI.

220.    Specifically, HIPAA required Defendant Young Consulting to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it created, received, maintained, or transmitted; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and

(d) ensure compliance by their workforces to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et. seq.*

221.   HIPAA also requires Defendant Young Consulting to provide Plaintiffs and the Class Members with notice of any breach of their individually identifiable PHI "without unreasonable delay and in no case later than 60 calendar days after discovery of the breach." 45 C.F.R. §§ 164.400-414.

222.   Defendant Young Consulting violated HIPAA by actively disclosing Plaintiffs and the Class Members' electronic PHI; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PHI; by failing to protect against foreseeable security threats such as ransomware attacks; and by failing to provide Plaintiffs and Class Members with adequate notification of the Data Breach within 60 days after its discovery.

223.   Defendant Young Consulting knew, or should have known, of the risks inherent in collecting and storing Private Information in a centralized location, its vulnerability to ransomware and network attacks, and the importance of adequate security.

224.   Defendant Young Consulting's breached its duties to Plaintiffs and Class Members in numerous ways, as described herein, including by:

    a.   Failing to exercise reasonable care and implement adequate

security systems, protocols, and practices sufficient to protect the Private Information of Plaintiffs and Class Members;

b.    Failing to comply with industry standard data security measures leading up to the Data Breach;

c.    Failing to protect against foreseeable security threats such as ransomware attacks;

d.    Failing to comply with its own privacy policies and those of the entities for which it provided services;

e.    Failing to comply with regulations protecting the Private Information at issue during the period of the Data Breach;

f.    Failing to adequately monitor, evaluate, and ensure the security of its network and systems;

g.    Failing to recognize in a timely manner that Private Information had been compromised; and

h.    Failing to timely and adequately disclose the Data Breach.

225.    Plaintiffs' and Class Members' Private Information would not have been compromised but for Defendant Young Consulting's wrongful and negligent breach of its duties.

226.    Defendant Young Consulting's failure to take proper security measures to protect the sensitive Private Information of Plaintiffs and Class Members created

conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access and exfiltration of Private Information by unauthorized third parties. Given that health insurers and healthcare service providers are prime targets for hackers, Plaintiffs and Class Members are part of a foreseeable, discernible group that was at high risk of having their Private Information misused or disclosed if not adequately protected by Defendant Young Consulting.

227.   It was also foreseeable that Defendant Young Consulting's failure to provide timely and forthright notice of the Data Breach would result in injury to Plaintiffs and Class Members.

228.   As a direct and proximate result of Defendant Young Consulting's conduct, Plaintiffs and Class Members have and will suffer monetary and non-economic damages including: (i) the loss of rental or use value of their Private Information; (ii) the unconsented disclosure of their Private Information (including medical information) to unauthorized third parties; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on

credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in Defendant Young Consulting's possession and is subject to further unauthorized disclosures so long as Defendant Young Consulting fails to undertake appropriate and adequate measures to protect it; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by Defendant Young Consulting's data breach; (x) the loss of the benefit of the bargain for the failure of Defendant Young Consulting to securely store and maintain their Private Information; and (xi) any nominal damages that may be awarded.

229.   Plaintiffs and Class Members seek all available damages suffered as a result of Young Consulting's negligence, including compensatory, consequential, general, and/or nominal damages.

## COUNT II

### Negligence *Per Se*
### *(On Behalf of Plaintiffs and the Young Consulting Class Against Defendant Young Consulting)*

230.   Plaintiffs repeat and reallege by every allegation set forth in Paragraphs 1 through 193 above as though fully set forth herein.

231.   Section 5 of the FTC Act prohibits "unfair … practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities, such as Young Consulting, for failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Defendant's duty.

232.   Young Consulting violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with industry standards, including but not limited to failing to protect against foreseeable security threats such as ransomware attacks. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of a data breach involving its medical stop loss insurance industry clients.

233.   Plaintiffs and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

234.   The harm that has occurred as a result of Young Consulting's conduct is the type of harm that the FTC Act was intended to guard against.

235.   Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

236.   As a business associate, Young Consulting is an entity covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

237.   Pursuant to HIPAA, 42 U.S.C. § 1302d, *et seq.*, and its implementing regulations, Young Consulting had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiffs' and the Class Members' electronic PHI.

238.   Specifically, HIPAA required Young Consulting to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et. seq*.

239.   HIPAA also requires Young Consulting to provide Plaintiffs and the Class Members with notice of any breach of their individually identifiable PHI "without unreasonable delay and in no case later than 60 calendar days after discovery of the breach." 45 C.F.R. §§ 164.400–414.

240.   Young Consulting violated HIPAA by actively disclosing Plaintiffs and the Class Members' electronic PHI; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PHI; by failing to protect against foreseeable security threats such

as ransomware attacks; and by failing to provide Plaintiffs and Class Members with adequate notification of the Data Breach within 60 days after its discovery.

241.  Plaintiffs and Class Members are patients within the class of persons HIPAA was intended to protect, as they are insured or have insurance processed by one of Defendant's clients.

242.  The harm that has occurred as a result of Young Consulting's conduct is the type of harm that HIPAA was intended to guard against.

243.  Young Consulting's violation of HIPAA constitutes negligence *per se.*

244.  As a direct and proximate result of Young Consulting's negligence, Plaintiffs and Class Members have suffered injuries, including those identified above.

245.  As a direct and proximate result of Young Consulting's negligence, Plaintiffs and Class Members have been injured as described herein and are entitled to damages in an amount to be proven at trial.

## COUNT III

### Negligence
### *(On Behalf of Plaintiffs and the Blue Shield Class Against Defendant Blue Shield)*

246.  Plaintiffs repeat and reallege every allegation set forth in Paragraphs 1 through 193 above as though fully set forth herein.

247.   Defendant Blue Shield and/or their affiliates obtained Plaintiffs' and Class Members' Private Information in order to provide insurance services for commercial gain. Defendant Blue Shield collected and stored this Private Information for purposes of providing services to Plaintiffs and Class Members.

248.   By collecting and storing Plaintiffs' and Class Members' Private Information, Defendant Blue Shield owed Plaintiffs and Class Members a duty to exercise reasonable care in protecting their Private Information from unauthorized disclosure or access.

249.   Defendant Blue Shield owed a duty of care to Plaintiffs and Class Members to provide adequate data security, consistent with industry standards, to ensure that its systems and networks adequately protected the Private Information. This duty extended to ensuring that its contractors such as Defendant Young Consulting were providing adequate data security to protect the Private Information of Plaintiffs and Class Members that Blue Shield provided to Young Consulting.

250.   Defendant Blue Shield's duty to use reasonable care in protecting Private Information arises as a result of the parties' relationship through healthcare providers, common law and federal law, and Defendants' own policies and promises regarding privacy and data security. Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices.

251.   Defendant Blue Shield and Plaintiffs and Class Members have a special relationship that gives rise to a duty to protect.

252.   This special relationship arises from Defendant Blue Shield's control over the means of protection of Plaintiffs and the Class Members' Private Information; Defendant Blue Shield was in a superior position to ensure its and Young Consulting's systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members resulting from a data breach; Blue Shield's selection of its business associates such as Young Consulting; Plaintiffs' and Class Members' reliance on Defendant Blue Shield for protection of their Private Information; and the benefit conferred on Defendant Blue Shield, Defendant Blue Shield could not survive in business without securing Plaintiffs' and Class Members' Private Information.

253.   Given the sensitivity of the Plaintiffs' and Class Members' Private Information, and given the history of data breaches against other entities in the healthcare sector, it was foreseeable that cybercriminals would attempt to steal Plaintiffs' and Class Members' Private Information.

254.   Defendant Blue Shield was aware of and embraced its duty to exercise reasonable care in handling the Private Information of Plaintiffs and Class Members.

255.   For example, Defendant Blue Shield's *Code of Conduct*, which applies to (among other individuals) its employees, contractors, business partners, and "anyone else working on our behalf."[98]

256.   With response to cybersecurity and privacy, this Code of Conduct states:[99]

    a.    "**Practice good cybersecurity**. To prevent unauthorized access to our electronic and information assets, use our systems properly. Watch for potential cyberthreats and carefully follow our IT policies and cybersecurity rules, such as:

        i.    Create strong passwords, update them regularly, and never share them.

        ii.    Never click on suspicious links or downloads.

        iii.    Only use hardware, software, and applications that are approved by Blue Shield.

        iv.    Do not access Blue Shield information on unsecured networks, such as public Wi-Fi (for example, a hotel, café, or other public venue network). Follow our policies to protect confidential and proprietary information as well as

---

[98] *Blue Shield Code of Conduct*, *supra*, note 13.

[99] *Id.* at 19–21.

personal information.

v.     Contact Information Security, Risk, and Operations (ISRO) if you see or suspect unauthorized access to our systems or data.

vi.    Follow Blue Shield's procedure to report suspicious emails. Reach out to Blue Shield's Information Security, Risk, and Operations (ISRO) for more information."

b.    "Use Special care with personal information and personal health information. Blue Shield collects a great deal of individually identifiable personal information ("IIPI") and protected health information ("PHI") that belongs to our members, patients, customers, business partners, and employees. Follow data privacy laws carefully as well as storage guidelines (if any) to protect it. To learn more, see Preserve privacy."

c.    "Preserve Privacy. *We recognize that privacy is a basic human right*. That is why we respect the personal information we collection, handling it with care, and following all laws designed to protect it."

d.    "Know what is personal. Personal information is anything that can be used to identify someone. At Blue Shield, that can include

individually identifiable personal information (IIPI), protected health information (PHI), and other sensitive information. It includes:

   i.    Name, address, phone number, or email

   ii.    Birthdate

   iii.    Social Security number

   iv.    Driver's license number

   v.    Banking or credit card information

   vi.    Medical information, including treatment, health status, and medical history

   vii.    Claims payment and benefit information

   viii.    Location data

   ix.    Company payroll data

   x.    Employee identification numbers"

e.    "Privacy is a right. We recognize that each person has a say in how their data is …

   i.    Collected

   ii.    Stored

   iii.    Used

   iv.    Deleted." *Id.*

f.  "Treat personal information with respect. Recognize your
responsibility to handle personal data respectfully and securely –
as you would treat your own. That means collecting, accessing,
and storing or disposing of personal data properly and legally. If
you are aware of a possible breach of personal data, contact Blue
Shield Law immediately."

g.  "Lead with integrity. When you handle personal data, ask
yourself: Am I…Carefully following our cybersecurity policies?
Using personal information for true business purposes?
Collecting only the information I need? Only sharing it with
authorized sources? Honoring each person's privacy rights?
Make sure you can answer YES to each of these questions. If you
cannot, stop and seek guidance."

257.  Young Consulting was also bound by Blue Shield's *Supplier Code of
Conduct*, which further mandated, among other things, that suppliers are responsible
for "protecting the confidentiality, and maintaining the security, of all individually
identifiable personal information and/or company confidential information" they
collect, access, or use while acting on behalf of Blue Shield. This includes PHI

HIPAA, 42 U.S.C. § 1320d *et seq*. and other sensitive data protected by federal and state law.[100]

258.   Blue Shield failed to ensure that Young Consulting was properly adhering to its *Code of Conduct* and *Supplier Code of Conduct*.

259.   Further, Defendant Blue Shield was a party to the California Health and Human Services DSA. Blue Shield was obligated to, among other things, "maintain[] a secure environment that supports the exchange of PHI or PII…" (DSA, at 4), and to require "Third-Party Technology vendors to (i) provide reliable, stable, and secure services to the Participant and (ii) to adhere to the same or similar privacy and security standards applicable to the Participant…" (DSA, at 7).

260.   Notwithstanding its representations of participation in the DSA, Defendant Blue Shield negligently failed to ensure Young Consulting was maintaining the Private Information of Plaintiffs and Class Members securely, causing the theft of the Private Information.

261.   Further, on its website, Defendant Blue Shield posted a *Notice of Privacy Practices*, with an effective date of August 16, 2013, and which is made available upon request.[101] This Notice contained a number of promises and representations regarding data security, including the following:

---

[100]  *Blue Shield Supplier Code of Conduct*, *supra*, note 18.

[101]  *Notice of Privacy Practices*, *supra*, note 10.

a.    "At Blue Shield, we understand the importance of keeping your personal information private, and we take our obligation to do so very seriously."

b.    "We are required to maintain the privacy of your PHI and to notify you in the event that you are affected by a breach of unsecured PHI."

c.    "[w]e maintain physical technical and administrative safeguards to ensure the privacy of your PHI."

d.    "Workforce members are trained on topics including: privacy and data protection policies and procedures, including:

   i.    how paper and electronic records are labeled, stored, filed and accessed.

   ii.   Physical, technical, and administrative safeguards in place to maintain the privacy and security of your PHI."

262.   Defendant Blue Shield also posts on its website a *HIPAA Notice of Privacy Practices*,[102] which includes the same or similar representations, and additional representations such as:

a.    "We will obey any and all laws that require us to give you privacy protections, including HIPAA and any other federal or California

---

[102] *HIPAA Notice of Privacy Practices*, *supra*, note 12.

privacy law."

b.    "To the extent federal and California privacy laws set forth different standards for certain health information, we will apply the standard that affords your health information the greater degree of protection and security, unless otherwise required by law."

263.    Defendant Blue Shield failed to meet these obligations, including by failing to ensure that Defendant Young Consulting was storing and maintaining Plaintiffs' and Class Members' Private Information securely.

264.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. 15 U.S.C. § 45(a)(1).

265.    The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

266.    Defendant Blue Shield violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and failing to comply with applicable industry standards. Defendant Blue Shield's conduct was unreasonable given the nature and amount of Private Information it obtained, stored, and disseminated in the regular course of their business, and the foreseeable

consequences of a data breach, including, specifically, the significant damage that would result to Plaintiffs and Class Members.

267.   Defendant Blue Shield is an entity covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

268.   Pursuant to HIPAA, 42 U.S.C. § 1302d, *et seq.*, and its implementing regulations, Defendant Blue Shield had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiffs and the Class Members' electronic PHI.

269.   Specifically, HIPAA required Defendant Blue Shield to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it created, received, maintained, or transmitted; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce and business associates to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et. seq*.

270.   HIPAA also requires Defendant Blue Shield to provide Plaintiffs and the Class Members with notice of any breach of their individually identifiable PHI "without unreasonable delay and in no case later than 60 calendar days after discovery of the breach." 45 C.F.R. §§ 164.400-414.

271.   Defendant Blue Shield violated HIPAA by actively disclosing Plaintiffs' and the Class Members' electronic PHI; by failing to ensure its business associates provided fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PHI; and by failing to provide Plaintiffs and Class Members with notification of the Data Breach within 60 days after its discovery.

272.   Defendant Blue Shield knew, or should have known, of the risks inherent in collecting and storing Private Information in a centralized location, Defendant Young Consulting's'vulnerability to network attacks, and the importance of adequate security.

273.   Defendant Blue Shield breached its duty to Plaintiffs and Class Members in numerous ways, as described herein, including by:

a.   Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the Private Information of Plaintiffs and Class Members;

b.   Failing to exercise reasonable care by ensuring that its business associate Young Consulting implemented adequate security systems, protocols, and practices sufficient to protect the Private Information of Plaintiffs and Class Members;

c.   Failing to ensure compliance with industry standard data security

measures leading up to the Data Breach;

d.   Failing to ensure compliance with its own privacy policies;

e.   Failing to ensure compliance with regulations protecting the Private Information at issue during the period of the Data Breach;

f.   Failing to adequately monitor, evaluate, and ensure the security of its and Young Consulting's network and systems;

g.   Failing to recognize in a timely manner that Private Information had been compromised; and

h.   Failing to timely and adequately disclose the Data Breach.

274.   Plaintiffs' and Class Members' Private Information would not have been compromised but for Defendant Blue Shield's wrongful and negligent breach of their duties.

275.   Defendant Blue Shield subject to an independent legal duty, untethered to any contract between it and either Plaintiffs or Class Members. The sources of Blue Shield's duties are alleged and described above.

276.   Defendant Blue Shield's failure to take proper security measures to protect the sensitive Private Information of Plaintiffs and Class Members created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access and exfiltration of Private Information by unauthorized third parties. Given that health insurers and healthcare service providers are prime targets

for hackers, Plaintiffs and Class Members are part of a foreseeable, discernible group that was at high risk of having their Private Information misused or disclosed if not adequately protected by Defendants.

277.  It was also foreseeable that Defendant Blue Shield's failure to provide timely and forthright notice of the Data Breach would result in injury to Plaintiffs and Class Members.

278.  As a direct and proximate result Defendant Blue Shield's conduct, Plaintiffs and Class Members have and will suffer monetary and non-economic damages including: (i) the loss of rental or use value of their Private Information; (ii) the unconsented disclosure of their Private Information (including medical information) to unauthorized third parties; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in Defendant Blue Shield's possession and is subject to further unauthorized disclosures so long

as Blue Shield fails to undertake appropriate and adequate measures to protect it; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by the Data Breach; (x) the loss of the benefit of the bargain for the failure of Blue Shield to securely store and maintain their Private Information; and (xi) any nominal damages that may be awarded.

279.   Plaintiffs and Class Members seek all available damages suffered as a result of Blue Shield's negligence, including compensatory, consequential, general, and/or nominal damages.

## COUNT IV

### Negligence *Per Se*
### *(On Behalf of Plaintiffs and the Blue Shield Class Against Defendant Blue Shield)*

280.   Plaintiffs repeat and reallege by every allegation set forth in Paragraphs 1 through 193 above as though fully set forth herein.

281.   Section 5 of the FTC Act prohibits "unfair … practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities, such as Blue Shield, for failing to use reasonable measures to

protect Private Information. Various FTC publications and orders also form the basis of Defendant's duty.

282.    Blue Shield violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with industry standards, including but not limited to failing to ensure its business associates implemented sufficient safeguards with respect to the Private Information. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained, stored, and shared and the foreseeability of a data breach involving such information.

283.    Plaintiffs and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

284.    The harm that has occurred as a result of Blue Shield's conduct is the type of harm that the FTC Act was intended to guard against.

285.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

286.    Blue Shield is an entity covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

287.    Pursuant to HIPAA, 42 U.S.C. § 1302d, *et seq.*, and its implementing regulations, Blue Shield had a duty to implement and maintain reasonable and

appropriate administrative, technical, and physical safeguards to protect Plaintiffs' and the Class Members' electronic PHI.

288.    Specifically, HIPAA required Blue Shield to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce and business associates to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et. seq*.

289.    HIPAA also requires Blue Shield to provide Plaintiffs and the Class Members with notice of any breach of their individually identifiable PHI "without unreasonable delay and in no case later than 60 calendar days after discovery of the breach." 45 C.F.R. §§ 164.400–414.

290.    Blue Shield violated HIPAA by actively disclosing Plaintiffs' and the Class Members' electronic PHI; by failing to ensure its business associates provided fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PHI; by failing to protect against foreseeable security threats such as ransomware attacks; and by failing to provide Plaintiffs and Class Members with adequate notification of the Data Breach within 60 days after its discovery.

291.    Plaintiffs and Class Members are patients within the class of persons HIPAA was intended to protect, as they are insured or have insurance processed by one of Blue Shield's clients.

292.    The harm that has occurred as a result of Blue Shield's conduct is the type of harm that HIPAA was intended to guard against.

293.    Blue Shield's violation of HIPAA constitutes negligence *per se*.

294.    As a direct and proximate result of Blue Shield's negligence, Plaintiffs and Class Members have suffered injuries, including those identified above.

295.    As a direct and proximate result of Blue Shield's negligence, Plaintiffs and Class Members have been injured as described herein and are entitled to damages in an amount to be proven at trial.

## COUNT V

**Unjust Enrichment**
***(On Behalf of Plaintiffs and the Blue Shield Class Against
Defendant Blue Shield)***

296.    Plaintiffs repeat and reallege every allegation set forth in Paragraphs 1 through 193 above as though fully set forth herein.

297.    Plaintiffs assert their claim for unjust enrichment against Blue Shield in alternative to their breach of implied contract claim asserted against Blue Shield.

298.    Plaintiffs and Class Members have an interest, both equitable and legal, in the Private Information about them that was conferred upon, collected by, used

by, and maintained by Defendant Blue Shield and that was ultimately stolen in the Data Breach.

299.   Plaintiffs and Class Members procured health insurance services from Defendant Blue Shield, and thereby conferred a benefit upon it in the form of monies they paid for insurance premiums. Plaintiffs and Class Members also conferred their Private Information upon Blue Shield.

300.   Defendant Blue Shield benefited by the conferral upon it of the Private Information pertaining to Plaintiffs and the Class Members and by its ability to retain, use, and profit from that information. Blue Shield understood and valued these benefits.

301.   Defendant Blue Shield also understood and appreciated that the Private Information pertaining to Plaintiffs and Class Members was private and confidential and its value depended upon Defendant maintaining the privacy and confidentiality of that Private Information.

302.   Without Defendant Blue Shield's willingness and commitment to maintain the privacy and confidentiality of the Private Information, that Private Information would not have been transferred to and entrusted to Blue Shield. Further, if Defendant Blue Shield had disclosed that its data security measures were inadequate, or that it was exercising insufficient oversight over the data security

measures of its contractors, Blue Shield would not have been permitted to continue in operation by regulators or their clients.

303.    In its *Code of Conduct*, *Supplier Code of Conduct*, and *Privacy Policy*, and by its participation in the DSA, Defendant Blue Shield admits that it understands the importance of keeping the personal information of Plaintiffs and Class Members private and maintaining appropriate safeguards to maintain the privacy and security of their PHI.[103]

304.    Because of Defendant Blue Shield's use of Plaintiffs' and Class Members' Private Information, Defendant Blue Shield sold more services and products than they otherwise would have. Blue Shield was unjustly enriched by profiting from the additional services and products it was able to market, sell, and create to the detriment of Plaintiffs and Class Members.

305.    Defendant Blue Shield also benefitted through its unjust conduct by retaining money that it should have used to provide reasonable and adequate data security to protect Plaintiffs' and Class Members' Private Information, or to exercise sufficient oversight over the data security practices of its contractors.

306.    Defendant Blue Shield also benefited through its unjust conduct in the form of the profits it gained through the use of Plaintiffs' and Class Members'

---

[103] *See, e.g.*, *Blue Shield Code of Conduct*, *supra*, note 13; *Notice of Privacy Practices*, *supra*, note 10, at 1; Single Data Sharing Agreement, *supra*, note 24.

Private Information.

307.   It is inequitable for Defendant Blue Shield to retain these benefits.

308.   As a result of Defendant Blue Shield's wrongful conduct as alleged in this Complaint (including among other things their failure to employ and oversee adequate data security measures, their continued maintenance and use of the Private Information belonging to Plaintiffs and Class Members without having adequate data security measures, and their other conduct facilitating the theft of that Private Information), Defendant Blue Shield have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and Class Members.

309.   Defendant Blue Shield's unjust enrichment is traceable to and resulted directly and proximately from the conduct alleged herein, including the compiling and use of Plaintiffs' and Class Members' sensitive Private Information, while at the same time failing to ensure that information maintained was secure from intrusion and theft by hackers and identity thieves.

310.   It is inequitable, unfair, and unjust for Blue Shield to retain these wrongfully obtained benefits. Blue Shield's retention of wrongfully obtained monies violates fundamental principles of justice, equity, and good conscience.

311.   The benefit conferred upon, received, and enjoyed by Defendant Blue Shield was not conferred gratuitously, and it would be inequitable, unfair, and unjust for Blue Shield to retain the benefit.

312.   Defendant Blue Shield's defective security and their unfair and deceptive conduct have, among other things, caused Plaintiffs and Class Members to unfairly incur substantial time and/or costs to mitigate and monitor the use of their Private Information and has caused the Plaintiffs and Class Members other damages as described herein.

313.   Plaintiffs and Class Members have no adequate remedy at law because of ongoing inadequate security practices, the injuries include an imminent risk of identity theft and fraud, and ongoing risk associated with medical fraud.

314.   Defendant Blue Shield is therefore liable to Plaintiffs and Class Members for restitution or disgorgement in the amount of the benefit conferred on Defendant as a result of its wrongful conduct, including specifically: the value to Defendant of the Private Information that was stolen in the Data Breach; the profit Defendant received and is receiving from the use of that information; the amounts that Defendant overcharged Plaintiffs and Class Members for use of its products and services; and the amounts that Defendant should have spent to provide reasonable and adequate data security to protect Plaintiffs' and Class Members' Private Information.

## COUNT VI

### Breach of Fiduciary Duty
***(On Behalf of Plaintiffs and the Young Consulting Class Against Defendant Young Consulting)***

315.   Plaintiffs repeat and reallege every allegation set forth in paragraphs 1 through 193 above as though fully set forth herein.

316.   Plaintiffs and Class Members have an interest, both equitable and legal, in their Private Information that was conveyed to, collected by, and maintained by Young Consulting and which was ultimately accessed or compromised in the Data Breach.

317.   The Private Information of Plaintiffs and Class Members was disclosed to Young Consulting. That Private Information is akin to the health information communicated to their medical providers when receiving medical care.

318.   In order to receive services for healthcare, Plaintiffs and Class Members had to disclose their Private Information to their insurers (such as Blue Shield and others), and ultimately to Young Consulting.

319.   As the recipient of Plaintiffs' and Class Members' Private Information, which was given to it in order to obtain health care and health insurance services, Young Consulting has a fiduciary relationship with Plaintiffs and Class Members.

320.   Young Consulting knew that Plaintiffs and Class Members had to unknowingly entrust their Private Information with it so that they could receive health insurance benefits, and ultimately, health care. Young Consulting therefore exercised a controlling influence over Plaintiffs and Class Members as it related to the security of their Private Information.

321. Young Consulting voluntarily undertook this fiduciary duty by knowingly contracting with insurers subject to HIPAA requirements, and as reflected in its representations that, among other things, its operations would be compliant with HIPAA and that it had sufficient safeguards to ensure data security.

322. Because of that fiduciary relationship, Young Consulting was provided with and stored Plaintiffs' and Class Members' valuable Private Information. Plaintiffs and Class Members expected their information to remain confidential while in Young Consulting's possession.

323. In light of the special relationship between Young Consulting and Plaintiffs and Class Members, Young Consulting became a fiduciary by undertaking a guardianship the Private Information to act for Plaintiffs and Class Members for: (a) the safeguarding of the Private Information; (b) the providing of timely notice of a Data Breach regarding that Private Information; and (c) the maintenance of complete and accurate records regarding the storage, usage of, and access to the Private Information.

324. Young Consulting breached its fiduciary duty to Plaintiffs and Class Members by not acting reasonably in collecting, storing, transmitting, and maintaining the Private Information; in failing to encrypt the Private Information; failing to protect the integrity of the systems containing Plaintiffs' and Class Members' Private Information; in failing to provide timely and sufficient notice of

a Data Breach regarding the Private Information; and by otherwise failing to safeguard Plaintiffs' and Class Members' Private Information from unauthorized access and disclosure.

325. Plaintiffs and Class Members did not consent to nor authorize Young Consulting to release or disclose their Private Information to unauthorized third parties or to cybercriminals.

326. As a direct and proximate result of Young Consulting's conduct, Plaintiffs and Class Members have and will suffer monetary and non-economic damages including: (i) the loss of rental or use value of their Private Information; (ii) the unconsented disclosure of their Private Information (including medical information) to unauthorized third parties; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in Young Consulting's possession and is subject to further unauthorized disclosures so long as

Young Consulting fails to undertake appropriate and adequate measures to protect it; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by Data Breach; (x) the loss of the benefit of the bargain for the failure of Young Consulting to securely store and maintain their Private Information; and (xi) any nominal damages that may be awarded.

327.   Plaintiffs and Class Members seek all available damages suffered as a result of Young Consulting's breach of its fiduciary duty, including compensatory, consequential, general, and/or nominal damages.

## COUNT VII

### Breach of Fiduciary Duty
### (*On Behalf of Plaintiffs and the Blue Shield Class Against Defendant Blue Shield*)

328.   Plaintiffs repeat and reallege every allegation set forth in paragraphs 1 through 193 above as though fully set forth herein.

329.   Plaintiffs and Class Members have an interest, both equitable and legal, in their Private Information that was conveyed to, collected by, and maintained by BlueShield and which was ultimately accessed or compromised in the Data Breach.

330.   The Private Information of Plaintiffs and Class Members was disclosed to Blue Shield. That Private Information is akin to the health information communicated to their medical providers when receiving medical care.

331.   In order to receive services for healthcare, Plaintiffs and Class Members had to disclose their Private Information to their insurers (such as Blue Shield), and ultimately (without their knowledge) to Young Consulting.

332.   As the recipient of Plaintiff's and Class Members' Private Information, which was given to it in order to obtain healthcare, Blue Shield has a fiduciary relationship with Plaintiffs and Class Members.

333.   Blue Shield knew that Plaintiffs and Class Members had no realistic choice but to entrust their Private Information with Blue Shield so that they could receive health insurance benefits, and ultimately, health care. Blue Shield therefore exercised a controlling influence over Plaintiffs and Class Members, and Plaintiffs and Class Members placed their confidence in Blue Shield as it related to the security of their Private Information.

334.   Blue Shield voluntarily accepted such confidence as reflected in its representations that, among other things, its operations and privacy practices would be compliant with HIPAA.

335.   Blue Shield has recognized its high duties with respect to data security, going so far as to "recognize that privacy is a basic human right," and acknowledging

that "[c]onnecting people with the care they need is personal business, involving personal information."[104]

336.   Because of that fiduciary relationship, Blue Shield was provided with and stored Plaintiffs' and Class Members' valuable Private Information. Plaintiffs and Class Members expected their information to remain confidential while in Blue Shield's possession.

337.   In light of the special relationship between Blue Shield and Plaintiffs and Class Members, Blue Shield became a fiduciary by undertaking a guardianship the Private Information to act for Plaintiffs and Class Members for: (a) the safeguarding of the Private Information, and exercising oversight over Young Consulting, to which it entrusted the Private Information; (b) the providing of timely notice of a Data Breach regarding that Private Information; and (c) the maintenance of complete and accurate records regarding the storage, usage of, and access to the Private Information.

338.   Blue Shield breached its fiduciary duty to Plaintiffs and Class Members by not acting reasonably in collecting, storing, transmitting, and maintaining the Private Information; in failing to ensure encryption of the Private Information; failing to ensure the systems containing Plaintiffs' and Class Members' Private Information were sufficiently protected; in failing to provide timely and sufficient

---

[104] *Blue Shield Code of Conduct, supra*, note 13, at 21.

notice of a Data Breach regarding the Private Information; and by otherwise failing to safeguard Plaintiffs' and Class Members' Private Information from unauthorized access and disclosure.

339. Plaintiffs and Class Members did not consent to nor authorize Blue Shield (or its contractor Young Consulting) to release or disclose their Private Information to unauthorized third parties or to cybercriminals.

340. As a direct and proximate result of Blue Shield's conduct, Plaintiffs and Class Members have and will suffer monetary and non-economic damages including: (i) the loss of rental or use value of their Private Information; (ii) the unconsented disclosure of their Private Information (including medical information) to unauthorized third parties; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in Blue Shield's possession and is subject to further unauthorized disclosures so long as Defendants

fail to undertake appropriate and adequate measures to protect it; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by the Data Breach; (x) the loss of the benefit of the bargain for the failure of Blue Shield to securely store and maintain their Private Information; and (xi) any nominal damages that may be awarded.

341.    Plaintiffs and Class Members seek all available damages suffered as a result of Blue Shield's breach of its fiduciary duty, including compensatory, consequential, general, and/or nominal damages.

## COUNT VIII

**Invasion of Privacy**
**Cal. Const., Art. I, § I**
*(On Behalf of Plaintiffs Desley-Bloom, Montero, and Murillo and the Blue Shield California Class Against Defendant Blue Shield)*

342.    Plaintiffs Desley-Bloom, Montero, and Murillo repeat and reallege every allegation set forth in paragraphs 1 through 193 above as though fully set forth herein.

343.    Plaintiffs and Class Members shared their Private Information with Blue Shield and/or their affiliates with the expectation that Plaintiffs and Class Members wanted to their Private Information to remain private and non-public.

112

344.    Indeed, in its *Code of Conduct*, Defendant Blue Shield recognizes "that privacy is a basic human right."

345.    Plaintiffs and Class Members have a right to privacy, enforceable under the California Constitution, to their private medical information, including diagnostic and treatment information contained in their insurance claims. The disclosure of such information is highly offensive and constitutes an egregious breach of social norms.

346.    Plaintiffs and Class Members reasonably expected that the Private Information they shared with Blue Shield would be protected and secured against access by unauthorized parties and would not be disclosed to or obtained by unauthorized parties or disclosed or obtained for any improper purpose.

347.    Blue Shield intentionally intruded into Plaintiffs' and Class Members' seclusion by allowing their Private Information to be obtained by a criminal third party.

348.    By failing to keep Plaintiffs' and Class Members' Private Information secure, and allowing for the disclosure of Private Information to unauthorized parties for unauthorized use, Blue Shield unlawfully invaded Plaintiffs' and Class Members' privacy right to seclusion by, inter alia:

       a.    Intruding into their private affairs in a manner that would be highly offensive to a reasonable person;

b.    Invading their privacy by improperly using their Private Information properly obtained for another purpose, or disclosing it to unauthorized persons;

c.    Failing to adequately secure their Private Information from disclosure to unauthorized persons; and

d.    Enabling the disclosures of their Private Information without consent.

349.    The Private Information that was compromised during the Data Breach was highly sensitive, private, and confidential, as it included claims information, which likely included information regarding medical diagnoses and treatment. Further, the Private Information included Social Security numbers and other information that is the type of sensitive, personal information that one normally expects will be protected from exposure by the entity charged with safeguarding it.

350.    The disclosure of such information would be highly offensive to a reasonable person, constituting an egregious breach of social norms.

351.    As a direct and proximate result of Blue Shield's invasion of privacy, Plaintiffs and Class Members suffered injury and sustained actual losses and damages as alleged herein. Plaintiffs and Class Members seek all available damages suffered as a result of Defendant's invasion of privacy, including compensatory, consequential, general, and/or nominal damages.

352.   Alternatively, Defendant Blue Shield is liable to Plaintiffs and Class Members for restitution or disgorgement in the amount of the benefit conferred on Defendant as a result of its wrongful conduct, including specifically: the value to Defendant of the Private Information that was stolen in the Data Breach; the profit Defendant received and is receiving from the use of that information; the amounts that Defendant overcharged Plaintiffs and Class Members for use of its products and services; and the amounts that Defendant should have spent to provide reasonable and adequate data security to protect Plaintiffs' and Class Members' Private Information.

## COUNT IX

### Breach of Implied Contract
***(On Behalf of Plaintiffs and the Blue Shield Class Against Defendant Blue Shield)***

353.   Plaintiffs repeat and reallege every allegation set forth in paragraphs 1 through 193 above as though fully set forth herein.

354.   Plaintiffs and Class Members were required to provide sensitive Private Information to Blue Shield as a precondition for receiving health insurance and healthcare services. As part of this exchange, there was an implied contract with Blue Shield when it accepted custody of their Private Information.

355.   As part of these transactions, Blue Shield agreed to safeguard and protect the Private Information of Plaintiffs and Class Members and to timely and

accurately notify them if it was breached or compromised.

356.   Plaintiffs and Class Members entered into the implied contracts with the reasonable expectation that Blue Shield's data security practices and policies were reasonable and consistent with the legal requirements, industry standards, and Blue Shield's own representations.

357.   For example, on its website, Defendant Blue Shield posted a *Notice of Privacy Practices*, with an effective date of August 16, 2013, and which is made available upon request.[105] This Notice contained a number of promises and representations regarding data security, including the following:

a.   "At Blue Shield, we understand the importance of keeping your personal information private, and we take our obligation to do so very seriously."

b.   "We are required to maintain the privacy of your PHI and to notify you in the event that you are affected by a breach of unsecured PHI."

c.   "[w]e maintain physical technical and administrative safeguards to ensure the privacy of your PHI."

d.   "Workforce members are trained on topics including: privacy and data protection policies and procedures, including:

---

[105] *Notice of Privacy Practices*, *supra*, note 10.

i.    how paper and electronic records are labeled, stored, filed and accessed.

ii.    Physical, technical, and administrative safeguards in place to maintain the privacy and security of your PHI."

358.   Blue Shield also posts on its website a *HIPAA Notice of Privacy Practices*,[106] which includes the same or similar representations, and additional representations such as:

a.    "We will obey any and all laws that require us to give you privacy protections, including HIPAA and any other federal or California privacy law."

b.    "To the extent federal and California privacy laws set forth different standards for certain health information, we will apply the standard that affords your health information the greater degree of protection and security, unless otherwise required by law."

359.   Blue Shield also has available on its website its *Code of Conduc*t, which makes a number of representations regarding the importance of cybersecurity and maintaining the privacy of its members' Private Information.

---

[106] *HIPAA Notice of Privacy Practices*, *supra*, note 12.

360.    Further, Blue Shield represents that its third-party associates upon which it relies (such as Young Consulting) will adhere to sufficient data security standards under the terms of its *Code of Conduct*, its *Supplier Code of Conduct*, and its participation in the DSA.

361.    Plaintiffs and Class Members reasonably believed that Defendant Blue Shield would use part of the monies paid to Defendant under the implied contracts or the monies obtained from the benefits derived from the Private Information they provided to fund proper and reasonable data security practices.

362.    Plaintiffs and Class Members would not have provided and entrusted their Private Information to Blue Shield or would have paid less for Blue Shield's products or services in the absence of the implied contract or implied terms between them and Blue Shield. The safeguarding of the Private Information of Plaintiffs and Class Members was material to realize the intent of the parties.

363.    Plaintiffs and Class Members fully performed their obligations under the implied contracts with Blue Shield.

364.    Blue Shield breached their implied contracts with Plaintiffs and Class Members to protect their Private Information when Blue Shield by: (1) failing to implement adequate data security to protect Plaintiffs' and Class Members' Private Information, or to exercise sufficient oversight over the data security practices of its contractors (including Young Consulting); (2) disclosing that information to

118

unauthorized third parties and; (3) failing to notify Plaintiffs and Class Members of the specific data breached in a reasonably timely manner.

365.   As a direct and proximate result of Blue Shields's breach of implied contract, Plaintiffs and Class Members have been injured and are entitled to damages. Plaintiffs and Class Members seek all available damages, including compensatory, consequential, general, and/or nominal damages, in an amount to be proven at trial.

## COUNT X

### Breach of Third-Party Beneficiary Contract
*(On Behalf of Plaintiffs and the Young Consulting Class Against Defendant Young Consulting)*

366.   Plaintiffs repeat and reallege every allegation set forth in paragraphs 1 through 193 above as though fully set forth herein.

367.   As a business associate that provides insurance services to Blue Shield and other health insurance providers, upon information and belief Young Consulting enters into Business Associate Agreements with Blue Shield and its other clients.

368.   A Business Associate Agreement is a contract under HIPAA that is between a covered entity (such as a health insurance company like Blue Shield) and business (such as Young Consulting) when that business performs certain functions on behalf of or provides a service to, the covered entity that involves the creation maintenance or transmission of PHI.

119

369.    A Business Associate Agreement establishes a business associate's permissible uses of PHI, hot the business associate will comply with HIPAA's Privacy Rule, and the responsibility of both the business associate and covered entity to maintain the privacy and security of PHI.

370.    On information and belief, Young Consulting entered into written contracts with Blue Shield and others regarding the use of Plaintiffs' and Class Members' Private Information for the provision of software services to assist in providing health insurance to Plaintiffs and Class Members, including entering into Business Associate Agreements.

371.    Young Consulting agreed, in part, to implement adequate security measures to safeguard the Private Information of Plaintiffs and the Class and to timely and adequately notify them of the Data Breach.

372.    Plaintiffs and Class Members are members of a class of people that the parties to the contracts intended to protect and benefit. Thus, Plaintiffs and Class Members are third-party beneficiaries of such contracts.

373.    Terms of compliance with HIPAA are expressly for the benefit of Plaintiffs and the Class Members, as the statute is intended to protect the information of individual patients. Therefore, these contracts were made expressly for the benefit of Plaintiffs and the Class, as Plaintiffs and Class Members were the intended third-party beneficiaries of the contracts entered into between Defendants. Young

Consulting knew that, if it were to breach these contracts, Plaintiffs and Class Members would be harmed.

374.   Young Consulting breached the contracts they entered into with Blue Shield and others by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately notifying Plaintiffs and Class Members of the Data Breach.

375.   As a direct and proximate result of Young Consulting's breaches of contract, Plaintiff and Class Members have been injured and are entitled to damages (including but not limited to special, consequential, and nominal damages) in an amount to be proven at trial.

## **COUNT XI**

### **Declaratory and Injunctive Relief**
***(On Behalf of Plaintiffs and the Young Consulting Class Against Defendant Young Consulting, and on Behalf of Plaintiffs and the Blue Shield Class Against Defendant Blue Shield)***

376.   Plaintiffs repeat and reallege every allegation set forth in paragraphs 1 through 193 above as though fully set forth herein.

377.   This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, which authorizes this Court to enter a judgment declaring the rights and legal relations of the parties and grant necessary further relief. Furthermore, the

Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statute and state common law as described in this Amended Complaint.

378.   Upon reason and belief, Defendants still possess the Private Information of Plaintiffs and the Members of the Classes. Further, Defendants still owe legal duties to adequately secure and protect the Private Information of Plaintiffs and Members of the Classes.

379.   There is no reason to believe that Young Consulting's security measures are any more adequate now than they were before the Data Breach to meet its legal duties. For example, since the Data Breach, Young Consulting has not yet announced any specific changes to its data security infrastructure, processes or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and go undetected and, thereby, prevent further attacks.

380.   Likewise, there is no reason to believe that Blue Shield's security measures are any more adequate now than they were before the Data Breach to meet its legal duties. For example, since the Data Breach, Blue Shield has not yet announced any specific changes to its data security practices or changes in how it may exercise oversight over Young Consulting's data security infrastructure.

381.   An actual controversy has arisen in the wake of the Data Breach regarding the Private Information of Plaintiffs and the Members of the Classes and

whether Defendants are currently maintaining data security measures adequate to protect from further data breaches that compromise such Private Information. Plaintiffs allege that Defendants' data security measures remain inadequate. Furthermore, Plaintiffs and the Members of the Classes continue to suffer injury as a result of the compromise of their Private Information as it remains accessible on the and remain at imminent risk that further compromises of their Private Information will occur in the future.

382.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    Defendants owe a legal duty to secure Private Information obtained from Plaintiffs and Members of the Classes and to timely notify such individuals of a data breach under the common law, Section 5 of the FTC Act, and HIPAA;

b.    Defendants breached and continue to breach this legal duty by failing to employ reasonable measures to secure consumers' Private Information; and

c.    Defendants breach of their legal duty continues to cause harm to Plaintiffs and the Members of the Classes.

383.    This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols (and oversight of such

protocols) consistent with law and industry standards to protect individuals' (i.e., those of Plaintiffs and the Members of the Classes) Private Information.

384.   If an injunction is not issued, Plaintiffs and the Members of the Classes will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Young Consulting. The risk of another such breach is real, immediate, and substantial. In fact, now that Young Consulting's insufficient data security is known to hackers, the Private Information in Young Consulting's possession is even more vulnerable to cyberattack. If another breach at Young Consulting occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

385.   The hardship to Plaintiffs and Class Members if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiffs will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a preexisting legal obligation to employ such measures.

386.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Young Consulting, thus eliminating the additional injuries that would

result to Plaintiffs, Class Members, and consumers whose confidential information

would be further compromised.

## COUNT XII

**Violation of the California Consumer Privacy Act
Cal. Civ. Code §§ 1798.100, *et seq.*
(On Behalf of Plaintiffs Desley-Bloom, Montero, and Murillo and the Young
Consulting California Class Against Defendant Young Consulting and on
Behalf of the Blue Shield California Class Against Defendant Blue Shield)**

387.   Plaintiffs Desley-Bloom, Montero, and Murillo repeat and reallege

every allegation set forth in paragraphs 1 through 193 above as though fully set forth

herein.

388.   The California Consumer Privacy Act ("CCPA"), Cal. Civ. Code §

1798.150(a), creates a private cause of action for violations of the CCPA. Section

1798.150(a) specifically provides:

> Any consumer whose nonencrypted and nonredacted personal
> information, as defined in subparagraph (A) of paragraph (1) of
> subdivision (d) of Section 1798.81.5, is subject to an
> unauthorized access and exfiltration, theft, or disclosure as a
> result of the business's violation of the duty to implement and
> maintain reasonable security procedures and practices
> appropriate to the nature of the information to protect the
> personal information may institute a civil action for any of the
> following:

> (A) To recover damages in an amount not less than one hundred
> dollars ($100) and not greater than seven hundred and fifty
> ($750) per consumer per incident or actual damages, whichever
> is greater.

> (B) Injunctive or declaratory relief.

(C) Any other relief the court deems proper.

389.    Plaintiffs and Members of the California Classes are consumers and California residents as defined by Cal. Civ. Code § 1798.140(i).

390.    Defendants are each businesses that are organized or operated for the profit or financial benefit of its shareholders or other owners, and each with annual gross revenues over $25 million.

391.    Defendants are businesses that collect consumers' Private Information as defined by Cal. Civ. Code § 1798.140(f). Specifically, Defendants obtain, receive, or access consumers' Private Information when providing health plan services and/or medical stop loss services.[107]

392.    Defendants determine the purposes and means of processing consumers' Private Information. Defendants, including Young Consulting, use consumers' personal data to provide services at customers' requests, as well as to develop, improve, and test Defendants' services.

393.    For example, Young Consulting performs analytics with consumer data to perform underwriting and block analysis. *See* *e.g.,*

---

[107] Blue Shield has been paying federal taxes for years and lost its California state tax exemption in 2015. *See* Chard Terhune, *With billions in the bank, Blue Shield of California loses its state tax-exempt status*, LA Times (Mar. 18, 2015), https://www.latimes.com/business/la-fi-blue-shield-california-20150318-story.html.

https://www.youngconsulting.com/esl-office/ (describing ESL Office software which assists with contact management, policy administration, claims auditing and reporting for specific and aggregate claims, communication of claimant underwriting recommendations, rate development, underwriting analytics, and block analytics). It also performs various reporting functions with consumers' personal data. *See e.g.,* https://www.youngconsulting.com/claimpointe/ (describing ClaimPointe software which is "a central reporting database that manages group funding requests and reporting, and proactively identifies stop loss filing requirements and communicates them).

394.   To the extent that Defendants store medical information or protected health information, upon information and belief, Defendants store non-medical patient information in a different manner than medical information.

395.   Defendants have a duty to implement and maintain reasonable data security procedures and practices to protect the Private Information of Plaintiffs and Members of the California Classes. As a direct and proximate result of Defendants' violations of their duty to implement and maintain reasonable security procedures and practices, their Private Information was subject to unauthorized access and exfiltration, theft and/or disclosure in violation of the CCPA, Cal. Civ. Code § 1798.150.

396.    Defendants violated Section 1798.150 of the California Consumer Privacy Act by failing to prevent the nonencrypted and nonredacted Private Information of Plaintiffs and Members of the California Classes from unauthorized access and exfiltration, theft, or disclosure as a result of Defendants' violation of their duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information.

397.    Defendants knew or should have known that their data security practices were inadequate to secure the Private Information of Plaintiffs and Members of the California Classes and that their inadequate data security practices gave rise to the risk of a data breach.

398.    Defendants failed to implement, maintain, and oversee reasonable security procedures and practices appropriate to the nature of the Private Information they collected and stored.

399.    The Private Information of Plaintiffs and Members of the California Classes at issue in this lawsuit constitutes "personal information" under § 1798.150(a) and 1798.81.5, in that the personal information Defendants collected and stored and which was impacted by the Data Breach include an individual's first name or first initial and the individual's last name in combination with one or more of the following data elements: (i) Social Security number; (ii) Driver's license number, California identification card number, tax identification number, passport

number, military identification number, or other unique identification number issued on a government document commonly used to verify the identity of a specific individual; (iii) account number or credit or debit card number, in combination with any required security code, access code, or password that would permit access to an individual's financial account; (iv) medical information; (v) health insurance information; (vi) unique biometric data generated from measurements or technical analysis of human body characteristics, such as a fingerprint, retina, or iris image, used to authenticate a specific individual.

400. Defendants stored and maintained the Private Information at issue in a form that allowed criminals to access it.

401. The cybercriminals accessed "nonencrypted and unredacted Private Information" as covered by Cal. Civ. Code § 1798.81.5(A)(1)(d), in the Data Breach.

402. Defendants violated the CCPA, Cal. Civ. Code § 1798.150(a), by failing to prevent the unencrypted and unredacted Private Information of Plaintiffs and Members of the California Classes from unauthorized access and exfiltration, theft, or disclosure.

403. Because Defendants are still in possession of such Private Information, Plaintiffs and the California Classes seek injunctive or other equitable relief to ensure that Defendants implement and maintain reasonable data security measures and practices to prevent an event like the Data Breach from occurring again.

404.   Plaintiffs seek injunctive relief in the form of an order requiring Defendants to employ adequate security practices consistent with law and industry standards to protect the Private Information of the Members of the California Classes, requiring Defendants to complete their investigation, and to issue an amended statement giving a detailed explanation that confirms, with reasonable certainty, what categories of data were stolen and accessed without the authorization of the of the Members of the California Classes, along with an explanation of how the data breach occurred.

405.   Plaintiffs and the Members of the California Classes seek statutory damages or actual damages, whichever is greater, pursuant to Cal. Civ. Code § 1798.150(a)(1)(A).

406.   As a direct and proximate result of Defendants' violations of the Cal. Civ. Code §§ 1798.150, Plaintiffs and the Members of the California Classes suffered damages, as described above.

407.   On October 10, 2024, Defendant Young Consulting was sent written notice of its violations pursuant to Cal. Civ. Code § 1798.150 by Plaintiff Montero.

408.   Young Consulting responded to Plaintiff Montero on or about October 18, 2024, claiming that "it took immediate steps to secure its computer environment, took steps to mitigate any potential risk to personal information, launched an investigation into the incident, and notified law enforcement." However, it offered

no specific information on how it cured "the facts and circumstances specific to the incident at issue. Nor did the response provide any information that it had implemented and maintained reasonable security procedures and practices appropriate to the nature of the information to protect Plaintiff Montero's Private Information.

409.    Because Young Consulting has not and cannot cure the noticed violation, Plaintiffs and the Members of the California Classes seek statutory damages pursuant to Cal. Civil Code § 1798.150(a)(1)(A).

410.    On July 16, 2025, Defendant Blue Shield was sent written notice of its violations pursuant to Cal. Civ. Code § 1798.150. Because Blue Shield has not and cannot cure the noticed violation, Plaintiffs and the Members of the California Classes seek statutory damages pursuant to Cal. Civil Code § 1798.150(a)(1)(A).

411.    Plaintiffs and the California Classes therefore seek all actual and compensatory damages according to proof or statutory damages allowable under the CCPA, whichever are higher, and such other and further relief as this Court may deem just and proper, including injunctive or declaratory relief.

## COUNT XIII

**California Unfair Competition Law**
**Cal. Civ. Code §§ 17200, *et seq.***
***(On Behalf of Plaintiffs and the Blue Shield Class Against***
***Defendants Young Consulting and Blue Shield)***

412.  Plaintiffs repeat and reallege each allegation every allegation set forth in paragraphs 1 through 193 above as though fully set forth herein.

413.  Defendants have engaged and continue to engage in unlawful and unfair business practices within the meaning of California's Unfair Competition Law ("UCL"), Business and Professions Code Sections 17200, *et seq*.

414.  Defendants stored, and continue to store, the Private Information of Plaintiffs and Class Members in their computer systems and/or networks.

415.  Defendants have known or should have known that they have not maintained or overseen reasonable and appropriate security measures that complied with federal regulations to safeguard consumers' Private Information.

416.  Moreover, Defendants failed to disclose that Plaintiffs' and Class Members' Private Information were susceptible to hackers due to Defendants' inadequate data security measures, and that Defendants were the only ones in possession of that material information. Defendants had a duty to disclose information regarding the susceptibility of Plaintiffs' and Class Members' Private Information.

417.  Defendants' actions and inactions have violated the "unlawful" prong of the UCL. Defendants violated Section 5(a) of the FTC Act (which is a predicate legal violation for this UCL claim) by misrepresenting, by omission, the safety and

security of their computer systems, and its ability to safely store Plaintiffs' and Class Members' Private Information.

418.   Defendants have further violated Section 5(a) of the FTC Act by failing to implement and oversee reasonable and appropriate security measures or follow industry standards in their data security practices, by failing to ensure their affiliates with which it directly or indirectly shared the Private Information did the same, and by failing to timely notify Plaintiffs and Class Members of the Data Breach.

419.   Additionally, Defendants' conduct have violated the "unlawful" prong because their conduct has (a) violated the California Consumer Records Act, Cal. Civ. Code 1798.80 *et seq.* (as described in Count XV herein); (b) violated California's Confidentiality of Medical Information Act, Cal. Civ. Code § 56 *et seq.*, (as described in Count XIV herein); (c) violated California's Consumer Privacy Act, Cal. Civ. Code § 1798.100 *et seq.* and § 1798.100, (as described in Count XII herein); (d) constituted negligence and negligence per se; and (e) and violated federal law and regulations, including Section 5 of the FTC Act and HIPAA as described in Counts III and IV herein).

420.   Had Defendants complied with these legal requirements to take proper measures to protect their Personal Information, Plaintiffs and Class Members would not have suffered the damages related to the Data Breach. Plaintiffs and Class

Members suffered additional damages from Defendants' failure to timely notify Plaintiffs and Class Members of the Data Breach.

421.    Defendants' actions and inactions have further violated the "unfair" prong of the UCL.

422.    Under the "balancing test," Defendants have engaged in unfair business practices. The harm caused by Defendants' actions and omissions, as described in detail above, greatly outweigh any perceived utility. Defendants' failure to follow and oversee basic data security protocols and failure to disclose inadequacies of Defendants' data security cannot be said to have had any utility at all. There were ample reasonable alternatives Defendants could have used to strengthen its data security. All of Defendants' actions and omissions in this respect were injurious to Plaintiffs and Class Members, directly causing the harms alleged below.

423.    Similarly, Defendants have engaged in unfair business practices under the "tethering test." Defendants' actions and omissions, as described herein, have violated fundamental public policies expressed by the California Legislature. *See, e.g.*, Cal. Civ. Code § 1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information

about California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern."). Defendants' acts and omissions thus amount to a violation of the California law.

424.   Defendants have engaged in unfair business practices under the "FTC test." The harm caused by Defendants' actions and omissions, as described in detail above, is substantial in that it affects thousands of Class Members and has caused those persons to suffer actual harm. Such harms include a substantial risk of identity theft, disclosure of Plaintiffs' and Class Members' Private Information to third parties without their consent, diminution in value of their Private Information.

425.   These unfair acts and practices have been immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Class Members. They have been likely to deceive the public into believing their Private Information was securely stored when it was not. The harm these practices have caused to Plaintiffs and Class Members outweighed their utility, if any. Defendants' wrongful conduct is substantially injurious to consumers, offends legislatively declared public policy, and is immoral, unethical, oppressive, and unscrupulous.

426.   Plaintiffs and Class Members continue to suffer harm, as Plaintiffs' and Class Members' Private Information remains in Defendants' possession, without

adequate protection, and remains in the hands of those who obtained it without their consent.

427.   Plaintiffs and Class Members have conferred a benefit on Defendants to purchase health insurance and as a necessary part of receiving healthcare services. Defendants knew that Plaintiffs and Class Members conferred this benefit upon them, and Defendants appreciated and accepted the benefit. Defendants have profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

428.   Plaintiffs and Class Members have suffered injury in fact and lost money or property as a result of Defendants' violations of the UCL. Plaintiffs and the Class Members were damaged and injured by, inter alia, the significant costs of protecting themselves from identity theft and by facing ongoing and impending damages related to the theft of their Private Information (including, for example, by purchasing or continuing to pay for credit monitoring); entering into transactions with Defendants that should have included adequate data security for their Private Information but did not; experiencing a diminution of value in their Private Information as a result if its theft by cybercriminals; the loss of Plaintiffs' and Class Members' legally protected interest in the confidentiality and privacy of their Private Information, and the right to control that information.

429. Defendants' conduct constitutes a continuing violation of the UCL because, on information and belief, Defendants have failed to ensure that the inadequate security practices have been remedied. Defendants still have not provided adequate information on the cause and scope of the Data Breach. The risk of another data breach is real, immediate, and substantial. Plaintiffs and the Class members seek equitable relief to require Defendants to institute and maintain reasonable security measures to protect their Private Information.

430. Plaintiffs and Class Members lack an adequate remedy at law because of ongoing inadequate security practices, and because the injuries include an imminent risk of identity theft and fraud, and ongoing risk associated with medical fraud.

431. Plaintiffs and Class Members seek all monetary and non-monetary relief available the UCL, including restitution of all profits stemming from Defendants' unlawful and unfair business practices or use of their Private Information; reasonable attorneys' fees and costs; injunctive relief; and other appropriate equitable relief.

## <u>COUNT XIV</u>

**California Confidentiality of Medical Information Act**
**Cal. Civ. Code §§ 56,** *et seq.*
*(On Behalf of Plaintiffs Desley-Bloom, Montero, and Murillo and the Young*
*Consulting California Class Against Defendant Young Consulting and on*
*Behalf of the Blue Shield California Class Against Defendant Blue Shield)*

432.   Plaintiffs Desley-Bloom, Montero, and Murillo restate and reallege the allegations set forth in paragraphs 1 through 193 above as though fully set forth herein.

433.   The Confidentiality of Medical Information Act ("CMIA") prohibits, among other things, unauthorized disclosure of private medical information. Cal. Civ. Code §§ 56, *et seq*.

434.   The Plaintiffs and the Members of the California Classes are "patients" as defined by Cal. Civ. Code § 56.05(k).

435.   Defendants are subject to the CMIA as "health care service plans," "contractors," and/or "providers of health care" as those terms are defined in the CMIA. *See* Cal. Civ. Code § 56.05(d), (g), and (o), and Cal. Civ. Code § 56.06.

436.   Defendants are providers of healthcare under Cal. Civ. Code § 56.06, subdivisions (a) and (b), because they are businesses organized to maintain medical information and offer software to consumers that is designed to maintain medical information for the purposes of allowing its users to manage their information or make the information available to a health care provider, or for the diagnosis, treatment, or management of a medical condition.

437.   For example, Defendant Young Consulting states that it "is the market leader in providing software solutions to the employer stop loss marketplace," and that it develops "integrated software solutions for the marketing, underwriting, and

administering      of      medical      stop      loss      insurance…"    *See*
https://www.youngconsulting.com/.

438.   Further, Defendant Blue Shield "is a nonprofit health plan dedicated to providing    Californians    with    access    to    high-quality    health    care…."
https://www.blueshieldca.com/en/home/about-blue-shield.

439.   The CMIA requires a "provider of health care, health care service plan, pharmaceutical company, or contractor who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information [to] do so in a manner that preserves the confidentiality of the information contained therein." Cal. Civ. Code § 56.101.

440.   The CMIA provides that "[e]very provider of health care, health care service plan, pharmaceutical company, or contractor who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36." *Id*; *see also* Ca. Civ. Code § 56.06(f)-(g) (requiring standards of confidentiality with respect to medical information and subjecting businesses to penalties for improper use and disclosure of medical information).

441.   At all relevant times, Defendants collected, stored, managed, and transmitted the PII and PHI of Plaintiffs and the Members of the California Classes, which is "medical information" as defined by Ca. Civ. Code. § 56.05(j).

442.   The medical information compromised included the full names, Social Security numbers, dates of birth, and unspecified "insurance policy/claim information" of Plaintiffs and the Members of the California Classes, which likely included the following medical treatment information: (a) names of physicians and healthcare providers; (b) dates of service or treatment; (c) names of laboratories and medical facilities; (d) test names and procedures performed; (e) internal patient identification numbers; and (f) health insurance policy and claim identifiers, as well as diagnosis and procedure codes, including CPT codes, which reveal specific medical services, tests, surgeries, evaluations, and procedures performed on the patient by a healthcare provider; and ICD codes, which disclose the specific conditions, diseases, physical or mental health diagnoses, and treatments associated with the patient. This information considered in its totality constitutes individually identifiable information regarding a patient's medical history, mental or physical condition, and/or treatment.

443.   Defendants stored, in electronic form on their computer systems, the medical information of Plaintiffs and the Members of the California Classes.

444.   Plaintiffs and Members of the California Classes did not provide Defendants authorization nor were Defendants otherwise authorized to disclose their medical information to an unauthorized third-party.

445.   As described herein, Defendant Young Consulting negligently maintained, disclosed and released the medical information of Plaintiffs and the Members of the California Classes inasmuch as it did not implement adequate electronic security system to prevent data breaches, or employ industry standard and commercially viable measures to mitigate the risks of any data breach or otherwise comply with HIPAA data security requirements.

446.   Defendant Blue Shield failed to exercise sufficient oversight to ensure that Young Consulting did not negligently maintain, disclose, and/or release the medical information of Plaintiffs and the Members of the California Classes. Blue Shield failed to exercise sufficient oversight to ensure that Young Consulting: a) implemented adequate electronic security system to prevent data breaches, and b) employed industry standard and commercially viable measures to mitigate the risks of any data breach or otherwise comply with HIPAA data security requirements.

447.   Defendants' conduct constitutes violations of the CMIA (including but not limited to Sections 56.06 and 56.101), which prohibit the negligent creation, maintenance, preservation, storage, abandonment, destruction or disposal of confidential personal medical information.

448.   As a direct and proximate result of Defendants' negligence, they disclosed and released the medical information of Plaintiffs and the Members of the

California Classes to an unauthorized third-party. This conduct violated the CMIA (including but not limited to Sections 56.06, 56.101, and 56.10(a)).

449.   Defendants' unauthorized disclosure of medical records has caused injury to the Plaintiffs and the Members of the California Classes.

450.   Upon information and belief, the confidential medical information of Plaintiffs and the Members of the California Classes was viewed by an unauthorized third party and published on the dark web where it is been accessed, downloaded, and re-circulated by other nefarious third-parties. Further, such confidential medical information remains accessible on the dark web as of the filing of this Complaint.

451.   As a direct and proximate result of Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach and their violations of the CMIA, Plaintiffs and Members of the California Classes are entitled to (i) actual damages, (ii) nominal damages of $1,000 per Class Member, and (iii) attorneys' fees, litigation expenses and court costs under California Civil Code § 56.35-.36.

## COUNT XV

**California Customer Records Act**
**Cal. Civ. Code §§ 1798.80, *et seq.***
***(On Behalf of Plaintiffs Desley-Bloom, Montero, and Murillo and the Blue***
***Shield California Class Against Defendant Blue Shield)***

452.   Plaintiffs Desley-Bloom, Montero, and Murillo restate and reallege the

allegations set forth in paragraphs 1 through 193 above as though fully set forth herein.

453.   Cal. Civ. Code § 1798.81.5 provides that "[i]t is the intent of the Legislature to ensure that Private Information about California residents is protected. To that end, the purpose of this section is to encourage businesses that own, license, or maintain personal information about Californians to provide reasonable security for that information." *Id.*

454.   Section 1798.81.5(b) further states that: "[a] business that owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

455.   Cal. Civ. Code § 1798.84(b) provides that "[a]ny customer injured by a violation of this title may institute a civil action to recover damages." Section 1798.84(e) further provides that "[a]ny business that violates, proposes to violate, or has violated this title may be enjoined."

456.   Plaintiffs and Class Members are "customers" of Blue Shield within the meaning of Cal. Civ. Code § 1798.80(c) and 1798.84(b) because they are individuals who provided personal information to Blue Shield (and thereby to Young Consulting) for the purposes of obtaining health plan services.

457.   Defendant is a business that owns, maintains, and licenses "personal information", within the meaning of Cal. Civ. Code § 1798.81.5(d)(1), about Plaintiffs and Class Members.

458.   The PII and PHI of Plaintiffs and Class Members at issue in this lawsuit constitutes "personal information" under § 1798.81.5(d)(1) in that the PII and PHI Defendants collect and which was impacted by the Data Breach includes an individual's first name or first initial and the individual's last name in combination with one or more of the following data elements, with either the name or the data elements not securely encrypted or redacted: (i) Social Security number; (ii) Driver's license number, California identification card number, tax identification number, passport number, military identification number, or other unique identification number issued on a government document commonly used to verify the identity of a specific individual; (iii) account number or credit or debit card number, in combination with any required security code, access code, or password that would permit access to an individual's financial account; (iv) medical information; (v) health insurance information; or (vi) unique biometric data generated from measurements or technical analysis of human body characteristics, such as a fingerprint, retina, or iris image, used to authenticate a specific individual.

459.   Moreover, Section 1798.2 of the California Civil Code requires any "person or business that conducts business in California, and that owns or licenses

144

computerized data that includes personal information" to "disclose any breach of the security of the system following discovery or notification of the breach in the security of the data to any resident of California whose unencrypted personal information was, or is reasonably believed to have been, acquired by expedient time possible and without unreasonable delay . . . ."

460.   Any person or business that is required to issue a security breach notification under the Customer Records Act must meet the following requirements under §1798.82(d):

> a.   The name and contact information of the reporting person or business subject to this section;
>
> b.   The name and contact information of the reporting person or business subject to this section;
>
> c.   If the information is possible to determine at the time the notice is provided, then any of the following:
>
>> i.   the date of the breach,
>> ii.   the estimated date of the breach, or,
>> iii.   the date range within which the breach occurred. The notification shall also include the date of the notice.
>
> d.   Whether notification was delayed as a result of a law enforcement investigation, if that information is possible to determine at the time the notice is provided;
>
> e.   A general description of the breach incident, if that information is possible to determine at the time the notice is provided;
>
> f.   The toll-free telephone numbers and addresses of the major credit reporting agencies if the breach exposed a social security number or a driver's license or California identification card

number;

g.    If the person or business providing the notification was the source of the breach, an offer to provide appropriate identity theft prevention and mitigation services, if any, shall be provided at no cost to the affected person for not less than 12 months along with all information necessary to take advantage of the offer to any person whose information was or may have been breached if the breach exposed or may have exposed personal information.

461.    Defendant Blue Shield is a business that owns or licenses computerized data that includes personal information as defined by Cal. Civ. Code § 1798.82(h).

462.    Plaintiffs' and Class Members' PII and PHI includes "personal information" as covered by Cal. Civ. Code §§ 1798.81.5(d)(1), 1798.82(h).

463.    The Data Breach described herein constituted a "breach of the security of the system" containing the personal information of Plaintiffs and Class Members.

464.    Because Blue Shield reasonably believed that Plaintiffs' and Class Members' PII and/or PHI was acquired by unauthorized persons during the Data Breach, it had an obligation to disclose the Data Breach in a timely and accurate fashion as mandated by Cal. Civ. Code § 1798.82.

465.    Defendant Blue Shield has unreasonably delayed informing Plaintiffs and Class Members about the Data Breach, affecting their PII and PHI, after Defendants knew that the Data Breach occurred. Specifically, Defendant knew about the Data Breach at least as early as June 2024, but never notified Plaintiffs or the

Class Members, who instead received notice from Young Consulting. Even the Young Consulting notice failed to sufficiently describe all the data that was stolen.

466.   By failing to disclose the Data Breach in a timely and accurate manner, Defendant Blue Shield violated Cal. Civ. Code § 1798.82

467.   As a result of Blue Shield's violations of Cal. Civ. Code § 1798.82, Plaintiffs and Class Members were deprived of prompt notice of the Data Breach and were thus prevented from taking appropriate protective measures, such as securing identity theft protection or requesting a credit freeze. These measures could have prevented some of the damages suffered by Plaintiffs and Class Members because their stolen information would have had less value to identity thieves.

468.   As a result of Blue Shield's violations of Cal. Civ. Code § 1798.82, Plaintiffs and Class Members suffered incrementally increased damages separate and distinct from those simply caused by the Data Breach itself.

469.   As a direct consequence of the actions as identified above, Plaintiffs and Class Members incurred additional losses and suffered further harm to their privacy, including, but not limited to, economic loss, the loss of control over the use of their identity, increased stress, fear, and anxiety, harm to their constitutional right to privacy, lost time dedicated to the investigation of the breach and effort to cure any resulting harm, the need for future expenses and time dedicated to the recovery and protection of further loss, and privacy injuries associated with having their

sensitive PII and PHI disclosed, that they would not have otherwise incurred, and are entitled to recover compensatory damages according to proof pursuant to § 1798.84(b).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes set forth herein, respectfully request the following relief:

A.    That the Court certify this action as a class action and appoint Plaintiffs and their Counsel to represent the Classes;

B.    That the Court grant permanent injunctive relief to prohibit and prevent Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

C.    That the Court award Plaintiffs and Class Members compensatory, consequential, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

D.    That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

E.    That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

F.    That the Court award pre-and post-judgment interest at the maximum

148

legal rate and all such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial in the instant action.

Dated: July 21, 2025

*/s/ J. Cameron Tribble*
J. Cameron Tribble
Georgia Bar No. 754759
**BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, GA 30060
Telephone: (770) 227-6375
ctribble@barneslawgroup.com

J. Austin Moore*
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
siegel@stuevesiegel.com
moore@stuevesiegel.com
tanner@stuevesiegel.com

Patrick D. Donathen*
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
gary@lcllp.com
patrick@lcllp.com

*Plaintiffs' Co-Lead Counsel*

***Attorneys for Plaintiffs and the
Proposed Class***

149

## CERTIFICATION OF COMPLIANCE

The undersigned hereby certifies that this pleading complies with the font requirements of LR 5.1B because the document has been prepared in Times New Roman 14-point font.

*/s/ J. Cameron Tribble*
J. Cameron Tribble


## CERTIFICATE OF SERVICE

I hereby certify that on this date I caused a copy of the foregoing document, **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** to be served via the Court's CM/ECF system, which will automatically send notice of such filing to all attorneys of record.

This 21st day of July, 2025.

*/s/ J. Cameron Tribble*
J. Cameron Tribble
Georgia Bar No. 754759
**BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, GA 30060
Telephone: (770) 227-6311
ctribble@barneslawgroup.com